578 A.2d 791

**Darone Antonio DERRICOTT**

v.

**STATE of Maryland.**

**No. 1606, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Sept. 4, 1990.

Certiorari Granted Jan. 9, 1991.

Philip H. Armstrong (Heeney, Armstrong & Heeney, on the brief), Rockville, for appellant.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Andrew L. Sonner, State's Atty. for Montgomery County, Rockville, on the brief), for appellee.

Argued before MOYLAN and KARWACKI, JJ., and JAMES S. GETTY (retired), Specially Assigned, J.

MOYLAN, Judge.

The appellant, Darone Antonio Derricott, was convicted in the Circuit Court for Montgomery County by Judge J. James McKenna, sitting without a jury, of the unlawful possession of cocaine with intent to distribute. There are no appellate issues arising out of the trial itself. The case proceeded on an agreed statement of facts. The undisputed facts established that when the appellant was stopped for speeding at 6:53 P.M. on June 3, 1988, the 1985 Nissan 300ZX which he was operating contained a cellophane bag, situated between the driver's seat and the center console, containing 43 "hits" of crack cocaine in individual glassine bags. The appellant was the only occupant of the automobile. Other paraphernalia typically employed by narcotics pushers, including a beeper, were also found on the center console and the right front seat. The appellant does not contest the legitimacy of the guilty verdict.

The appellant does contest, most strenuously, the denial of his Motion to Suppress the glassine bags of crack cocaine on the ground that the search of his automobile that produced the cocaine was unreasonable under the Fourth Amendment.[1]

## FACTUAL SUMMARY

Although certain facts will be developed and discussed more fully as they bear upon specific sub-issues in the case,

---

1. Initially, the appellant's Motion to Suppress was submitted to Judge Paul H. Weinstein. By agreement, no live testimony was taken at that hearing. The motion was decided on the basis of the State's proffer of a set of facts underlying the search and seizure. Judge Weinstein denied the motion. The appellant requested a rehearing and an opportunity to create a fuller record through live witnesses. Pursuant to Maryland Rule 4–252, the appellant was granted a *de novo* rehearing on the Motion to Suppress before Judge McKenna. The motion was again denied.

It is only the ruling of Judge McKenna at the conclusion of the *de novo* hearing that is before us, of course, and our review will, therefore, be limited to the testimony produced at that hearing. *Bartram v. State*, 33 Md.App. 115, 140, 364 A.2d 1119 (1976), *aff'd*, 280 Md. 616, 374 A.2d 1144 (1977).

a brief summary may help to provide background. The appellant was stopped for speeding. The traffic officer approached the appellant's vehicle as the appellant remained seated behind the wheel. The appellant turned over his driver's license and registration card uneventfully. The officer, during that brief initial encounter, did make certain observations about the appellant and about the automobile that took on subsequent significance. In the course of the initial stop, however, the officer did not notice anything that suggested the presence of either contraband or a weapon of any sort.

The officer returned to his police cruiser for the purpose of writing a traffic citation. He made a routine radio check with respect to the appellant's operator's license and registration card. The check revealed nothing out of the ordinary. The officer wrote out the citation for speeding but did not proceed immediately to reapproach the appellant's vehicle to issue the citation. The curbside detention was to some extent protracted beyond the time ordinarily required to issue a speeding ticket, as a second purpose emerged in the officer's mind. Because certain characteristics of the appellant and his vehicle matched the local drug courier profile for the Washington metropolitan area, the officer called for a drug-sniffing canine. He called, in addition, for police "backup." He awaited the arrival of that reinforcement before reapproaching the appellant because he now suspected that the appellant might be armed. He estimated that approximately seven minutes transpired between spotting the appellant's car on the radar screen and reapproaching the appellant for the second time with the traffic citation in hand.

Although the traffic ticket had been written, it was not then handed to the appellant. The appellant was instead requested to step out of his automobile. He was then frisked. No weapons were found on his person. As part of an extended frisk, the officer approached the automobile, the door of which was open. The officer leaned the upper part of his body into the automobile for the express purpose

of looking for weapons. As he did so, he was looking down at a center console between the two bucket seats. Between the driver's seat and the console, he observed approximately 20 per cent of a cellophane bag he suspected to contain narcotics. He seized the bag and found therein the contraband that formed the basis for the appellant's prosecution.

## THE IMMATERIALITY OF PROBABLE CAUSE

As we undertake our consideration of Fourth Amendment issues, we can narrow the focus significantly at the outset. Fully half of the appellant's brief was dedicated to discussing and analyzing the alleged absence of probable cause to support any of the police actions in this case. The appellant in that regard may well be right. Even if that be so, however, it is utterly immaterial.

The State's theory of the case, and the one obviously suggested by the evidence, is that 1) a routine stop for a speeding violation led to 2) the accumulation of articulable suspicion for a *Terry** stop for a narcotics violation which was, in turn, attended by 3) a *Terry* frisk for weapons. The necessary predicate for both a *Terry* stop and a *Terry* frisk is articulable suspicion, not probable cause.

On the continuum of escalating likelihood of guilt, the articulable suspicion level is well down the scale from the probable cause level. The settled law that it is a significantly lesser measure of likely guilt was recently rearticulated by Chief Justice Rehnquist in *United States v. Sokolow*, 490 U.S. 1, ——, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989):

"The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch." ' ... The Fourth Amendment requires 'some minimal level* of objective justification' for making the stop.... *That level of suspicion is considerably less than proof of wrongdoing by a preponderance*

---

* *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

*of the evidence.* We have held that probable cause means 'a fair probability that contraband or evidence of a crime will be found,' ... and *the level of suspicion required for a Terry stop is obviously less demanding than that for probable cause."* (Citations omitted). (Emphasis supplied).

*And see Quince v. State,* 319 Md. 430, 433–434, 572 A.2d 1086 (1990).

## THE TRAFFIC STOP

As we "bracket the target" of issue or issues to be resolved, we can move in a step or two closer. With respect to the traffic stop that set this episode in motion, there is no hint of subterfuge. This is not one of those cases where a narcotics officer, for instance, seizes the occasion, opportunistically, to observe a traffic violation on the part of a narcotics suspect.

Corporal Michael W. Thomas of the Maryland State Police was routinely performing stationary radar observations from the median strip of Interstate 270 at a point just northwest of the Capital Beltway. At 6:53 P.M. on June 3, 1988, he observed the appellant's vehicle travelling northbound at a speed of 89 miles per hour in a 55 miles-per-hour zone. He pursued the vehicle and directed it to the side of the road. The appellant produced his driver's license and his registration card and was ultimately issued a traffic citation for speeding. The appellant does not contest the legitimacy of the traffic stop.

## *PENNSYLVANIA v. MIMMS*

We can also eliminate another distinct component of the police conduct as noncontroversial. After the appellant had been initially approached by Corporal Thomas but just before the officer reapproached him for the second time, Corporal Thomas ordered the appellant out of his car.

*Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), established unequivocally that when the

police have legitimately stopped an automobile, for a traffic offense or for any other reason, they are automatically entitled to order the driver and/or any of the passengers to alight from the vehicle. No particularized justification is required. The rationale behind this blanket police prerogative is general concern for police safety under such potentially dangerous circumstances. The need having been established as a general rule, nothing by way of further justification is required on an individual occasion of its being invoked. In the *Mimms* case itself, there was no individualized justification:

"The State freely concedes the officer had no reason to suspect foul play from the particular driver at the time of the stop, there having been nothing unusual or suspicious about his behavior. It was apparently his practice to order all drivers out of their vehicles as a matter of course whenever they had been stopped for a traffic violation."

434 U.S. at 109–110, 98 S.Ct. at 332. The constitutional *imprimatur* on this police tactic is unequivocal, the Supreme Court saying, 434 U.S. at 111, 98 S.Ct. at 333:

"We think this additional intrusion can only be described as *de minimis.* The driver is being asked to expose to view very little more of his person than is already exposed. The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it. Not only is the insistence of the police on the latter choice not a 'serious intrusion upon the sanctity of the person,' but it hardly rises to the level of a ' "petty indignity." ' ... What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety." (Citation and footnote omitted).

Indeed, the appellant raises no issue with respect to his having been ordered to alight from his vehicle during the course of the encounter.

## THE FOCUS BECOMES BLURRED

At this point, it would appear that we have settled upon three key issues for ultimate resolution: 1) the legitimacy of the superseding *Terry* stop based upon articulable suspicion that the appellant was a drug courier, 2) the legitimacy of the attendant *Terry*-frisk based upon articulable suspicion that the appellant might be armed, and 3) the permitted geographic scope of that frisk. The appellant has come perilously close to conceding himself out of court, as he arguably concedes the propriety of both 1) the *Terry* stop and 2) the attendant frisk or pat-down of his person:

> "Both the State and Appellant agree that *the initial detention of the Appellant following the traffic violation was lawful. Appellant does not dispute the propriety of the initial patdown search*, for that search produced no evidence of any criminal wrongdoing. The dispute surrounds the use of the local drug courier profile as the sole predicate for the belief that the Appellant was dangerous and able to gain immediate control of a weapon from the vehicle, thereby justifying a warrantless search of the passenger compartment and/or Appellant." (Emphasis supplied).

If articulable suspicion for a *Terry* stop for narcotics trafficking were, indeed, conceded, that would go 95 per cent of the way (or more) toward establishing articulable suspicion for a *Terry*-frisk, with the right to frisk following virtually automatically from the very nature of the crime suspected. If the legitimacy of the frisk or pat-down of his person, moreover, were also conceded, the extension of the frisk into the passenger compartment of the automobile would then involve nothing more than a question of the geographic scope of the frisk and would bypass totally any challenge to its initial justification. We cannot believe that the appellant intended to concede so much.

It seems that the appellant's failure to challenge specifically the detention of his person arises from his mistaken belief that the detention for the speeding violation was the only detention involved in this case. It is rather the fact

that the initial stop for speeding gave way to a superseding stop based upon subsequently accruing articulable suspicion that the appellant was a drug courier.

■ Indeed, if that were not the case, the State might be facing a serious problem of a scope violation with respect to the length of the appellant's detention for the traffic offense. Once Corporal Thomas concluded that the appellant might be a drug courier, he requested both backup officers and a drug-sniffing dog. The backup, human and canine, arrived about five minutes later. A brief wait for the arrival of a drug-sniffing dog is a reasonable incident of a narcotics-related detention. *United States v. Place*, 462 U.S. 696, 706–707, 103 S.Ct. 2637, 2644–2645, 77 L.Ed.2d 110, 120–121 (1983). It is hardly necessary, on the other hand, to wait for a drug-sniffing dog to consummate the issuance of a speeding ticket. We will consider a challenge to the superseding, drug-related *Terry* stop properly to have been lodged.

Similarly, we will treat the apparent concession as to "the initial pat-down search" of his person as no more than an acknowledgment that the pat-down itself yielded no inculpatory fruits, rather than as a concession that it was constitutionally justified. The three issues, therefore, remain before us for consideration.

### ARTICULABLE SUSPICION OF
### NARCOTICS TRAFFICKING

In the course of stopping the appellant for the speeding violation, Corporal Thomas made the following observations. He noted that the appellant was a young, black male (he was 20 years of age at the time), driving an expensive sports car, a Nissan 300ZX (a two-seater sports car of a very expensive type). The appellant was wearing a blue sweatsuit, gold chains, and a thick, monogrammed gold

ring.[2]  As Corporal Thomas stood outside the driver's window and looked inside, he saw a beeper lying on the center console.[3]  He also noted on the passenger seat next to the appellant various papers containing phone numbers.  His subsequent radio check on the vehicle's registration revealed that it was registered jointly to the appellant and another.

Through both in-service training and bulletins furnished by the Narcotics Section, Corporal Thomas was familiar with the "local drug courier profile" compiled by the Narcotics Section of the Maryland State Police.  The profile listed the following characteristics of local drug couriers, which characteristics matched the appellant in this case:

1. Young, black males wearing expensive jewelry,

2. Driving expensive cars, usually sports cars,

3. Carrying beepers, and

4. In possession of telephone numbers.

On the basis of those observations, enhanced by his knowledge of their significance, Corporal Thomas reasonably suspected that the appellant might be a drug courier and concluded that he should be detained briefly for questioning and for the arrival of the drug-sniffing canine.

---

**2.** In commenting upon the articulable suspicion in *United States v. Sokolow, supra,* the Supreme Court noted not only Sokolow's relative youth (he was 25 years old) and his affluent living standard (paying $2,100 in cash for airline tickets) but also noted that "he was dressed in a black jumpsuit and wore gold jewelry."  490 U.S. at ——, 109 S.Ct. at 1583, 104 L.Ed.2d at 8.

**3.** In *Best v. State,* 79 Md.App. 241, 259–260, 556 A.2d 701 (1989), we discussed at length the logical relevance of the possession of a car phone on the issue that its possessor was a trafficker in narcotics. That was in the adversarial setting of a trial upon the merits, with formal rules of evidence prevailing and with a high burden of persuasion.  *A fortiori,* it would be admissible and relevant in the *ex parte* setting of a probable cause determination, without formal rules of evidence and with a much lower burden of persuasion.  We now observe that the probative force would be at least as great, if not greater, with respect to a beeper as opposed to a car phone and with the even lesser burden of persuasion of articulable suspicion.

## A PROFILE OF THE PROFILE

The notion of a "drug courier profile" first surfaced in the plurality opinion of Justice Powell, joined by Chief Justice Burger and Justice Blackmun, in *United States v. Mendenhall*, 446 U.S. 544, 560–566, 100 S.Ct. 1870, 1880–1883, 64 L.Ed.2d 497, 513–517 (1980). Although the investigative phenomenon reappeared on five subsequent occasions, *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *Florida v. Rodriguez*, 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984); and *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), the Supreme Court has made it clear that the undergirding legal and constitutional issue involved is simply the presence of articulable suspicion for a stop and/or frisk. The so-called profile is something that may have investigative and factual significance but no legal significance *per se*. It is but one of the ways in which an officer accumulates articulable suspicion.

Since a stop and frisk based upon a profile is but an instance of the broader phenomenon of stop and frisk generally, it would never suffice for an officer to make the blanket and conclusory statement that the suspect "fit the profile." It would be required, as it always is when an officer must articulate his articulable suspicion, that the officer recite the observed characteristics. Reference to the profile might then explain why he, on the basis of his own or the collective experience of the police team, could attach significance to the observed characteristics that an ordinary layman could not.

Indeed, the use of a profile is simply a means by which the law enforcement team communicates its collective expertise and empirical experience to the officer in the field and by which the officer, in turn, explains the special significance of his observations to the court. The value of that expertise was commented upon in the concurring opinion in *Mendenhall*, 446 U.S. at 563, 100 S.Ct. at 1882:

"In reviewing the factors that led the agents to stop and question the respondent, it is important to recall that a trained law enforcement agent may be 'able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer.' ... Among the circumstances that can give rise to reasonable suspicion are the agent's knowledge of the methods used in recent criminal activity and the characteristics of persons engaged in such illegal practices." (Citation omitted).

That the source of the expertise could be collective experience rather than requiring each officer in the field "to reinvent the wheel" for himself is the special investigative virtue of the profile:

"Federal agents have developed 'drug courier profiles,' that describe the characteristics generally associated with narcotics traffickers."

*Id.* at 562, 100 S.Ct. at 1881. In this regard, we ourselves observed in *Grant v. State,* 55 Md.App. 1, 7, 461 A.2d 524 (1983):

"The only legal significance to this umbrella term called 'the profile' is that the expertise of the police will be legitimately taken into consideration when we assess the significance of observations that might to the untrained layman seem completely ambiguous. The establishment of the profile by the Drug Enforcement Agency simply gives us the benefit of the collective expertise of many investigators working nationwide in this sensitive area of law enforcement. The special significance that a given observation might have to a trained and experienced policeman could always be established on a case-by-case basis, even if the 'profile' did not exist."

A profile, any profile, is simply an investigative tool. It is an investigative tool, moreover, that the officer who uses it may describe to the court as he explains the special significance that otherwise innocuous observations may have for him. Although in recent years special attention has been lavished upon the drug courier profile in the special setting of airports, it is by no means the only profile

utilized. There are pickpocket profiles, especially valuable for use at race tracks and other crowded areas. There are airplane highjacker profiles and terrorist profiles. Customs officers regularly select individuals for personal attention by using smuggler profiles. In the special world of drug smuggling, there is even a "balloon swallower" profile. *United States v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). There are also, as this case illustrates, drug courier profiles for highways and streets as well as for airports. *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), was a case where the Supreme Court affirmed the finding of articulable suspicion to stop a motorist essentially on the basis that a congeries of apparently innocuous driving characteristics were tell-tale indicia of couriers carrying drugs north and south along the Atlantic coastal highway.

It is important to remember that a profile is, in essence, a fact and not a legal principle. As a fact, it is as susceptible to change as the seasons. Tell-tale characteristics in one region or milieu may be very different from those in others. As counter-measures are constantly devised to meet the tactics of the opposition, the tell-tale characteristics of last year may not be the tell-tale characteristics of next year. Because of this inherent fluidity, it is particularly unfit for being frozen into a legal principle.

Because of the variable nature of the very concept of a profile, the indispensable rule for handling the concept is, "Think plural." It was with this in mind that we observed in *Grant v. State, supra,* at 55 Md.App. 6, 461 A.2d 524:

"An additional preliminary word is also in order about the so-called 'drug courier profile.' It is a convenient descriptive term without a great deal of legal significance. Some lament the fact that the Supreme Court has not yet told us whether meeting the so-called 'drug courier profile' is an adequate predicate to establish either articulable suspicion for a stop or probable cause for an arrest or search. Of course, the Supreme Court has not told us that and they never will. Indeed, they cannot, for

there is no such thing as a single drug courier profile; there are infinite drug courier profiles. The very notion is protean, not monolithic."

In the last analysis, it is never a profile *per se* that is the object of appellate review. The data to be scrutinized by the suppression hearing judge and appellate judge alike are the factual observations of the policeman. They may, to be sure, be interpreted through the collective police experience reflected in a profile. The ultimate issue, however, is whether the factual observations in combination, refracted through the trained eye of the policeman, yield articulable suspicion. Except as a guide to interpretation, the existence of a profile neither adds to nor subtracts from that computation. As Chief Justice Rehnquist explained in *United States v. Sokolow*, 490 U.S. at ——, 109 S.Ct. at 1587, 104 L.Ed.2d at 12:

"We do not agree with respondent that our analysis is somehow changed by the agents' belief that his behavior was consistent with one of the DEA's 'drug courier profiles.' A court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion, but the fact that these factors may be set forth in a 'profile' does not somehow detract from their evidentiary significance as seen by a trained agent." (Footnote omitted).

## A POLICEMAN IS NOT A JUDGE

The appellant complains vigorously that Corporal Thomas, even granting that his initial suspicion was reasonable, made no effort to verify or dispel that suspicion by asking the appellant to explain the luxurious car, the beeper, the phone numbers, etc. The appellant compiles a significant checklist of steps he thinks a "reasonable" officer should have taken:

"During the course of the encounter, Corporal Thomas did not make reasonable inquiries of the Appellant which could have disaffirmed Appellant's match [of] the local drug courier profile. Corporal Thomas did not ask Appel-

lant how he came into possession of his jewelry, beeper, or phone numbers. No inquiry was made as to how or why the Appellant was driving an expensive vehicle. Although aware that the vehicle was registered in the name of Appellant and a relative, Corporal Thomas did not ask Appellant whether the vehicle belonged to his mother, or whether it was bought for him."

There is no merit to the complaint. Its basic thrust is that the policeman acted liked a reasonable policeman and not like a judge.[4] In the after-the-fact tranquility of the courtroom, the judge is enjoined to hear all possible explanations for suspicious behavior before making dispassionate judgment as to what was the historic reality.

The role of the policeman, by contrast, is, generally speaking, to assemble his best case. In the context of stop and frisk situations particularly, the circumstances are such that "in dealing with the rapidly unfolding and often dangerous situations on city streets the police are in need of an escalating set of flexible responses." *Terry v. Ohio, supra,* at 392 U.S. 10, at 88 S.Ct. 1874. What is required is not the thorough probing and counter-probing of the courtroom but "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat." *Id.* at 20, 88 S.Ct. at 1879.

In one sense, the appellant's suggestion is disingenuous. He argues that the officer should ask the suspect to explain suspicious circumstances but gives no reason why the officer, trained to be skeptical, should believe the explanations. The officer could hardly be required to go further afield by way of verifying the explanations for himself. In the first place, this would be the very antithesis of the "necessarily swift action" contemplated by *Terry v. Ohio* and its proge-

---

**4.** Ironically, although the appellant is much chagrined at Corporal Thomas for failing to seek an innocuous explanation at the roadside, the appellant failed to offer any innocuous explanation himself when the opportunity was presented at the suppression hearing. Had one been available, it is hard to imagine that it would not somehow have found its way into the case.

ny. In the second place, it would involve the paradox of detaining the suspect even while deciding whether there was good cause to detain him. If there were enough reason to hold the suspect while the verification was in progress, the verification would be redundant. If there were not, the suspect would have to be released before the verification could even take place.

The phenomenon of verifying or dispelling the initial suspicion is not a precondition for a *Terry* stop but rather the very object of an already consummated *Terry* stop. If the initial suspicion is dispelled, the *Terry* stop comes to an end and the suspect is free to leave. If, on the other hand, the initial suspicion is sufficiently verified, the stop ripens into an arrest.

In this case, moreover, Corporal Thomas did take an appropriate step to verify or dispel his initial suspicion. He summoned a trained drug-sniffing dog to the scene. The dog, with neither motive nor capacity to fabricate, would not suffer the same credibility gap as would the appellant's explanations. Had no other event intervened, the dog, within five minutes, would, quickly and fairly, have verified or dispelled the initial suspicion.

The defendant in *United States v. Sokolow, supra,* made the same argument as does the appellant here that a reasonable inquiry should be a necessary preliminary to a *Terry* detention. It was Sokolow's position that, "the agents should have simply approached and spoken with him, rather than forcibly detaining him." 490 U.S. at ——, 109 S.Ct. at 1587, 104 L.Ed.2d at 12. Although that might have been less intrusive, the Supreme Court was clear that the reasonableness of a *Terry* stop does not turn upon the availability of less intrusive means:

"The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques. Such a rule would unduly hamper the police's ability to make swift on-the-spot decisions —here, respondent was about to get into a taxicab—and

it would require courts to 'indulge in "unrealistic second-guessing." ' "

*Id.*

## ARTICULABLE SUSPICION FOR THE SUPERSEDING TERRY STOP

■ We hold that there was sufficient articulable suspicion that the appellant was a drug courier to justify the *Terry* stop that superseded the traffic stop. In measuring articulable suspicion, of course, we are actually making and then comparing two measures. Judging Fourth Amendment reasonableness is a balancing process and balancing, by definition, is an exercise in relativity. A minimal justification can outweigh a minimal intrusion just as surely as a weightier justification can outweigh a weightier intrusion. Our concern is not with absolute weight but with relative weight.

On one side of the scale is both the public interest in curbing crime and police expertise in evaluating evidence. The concurring opinion of Justice Powell in *United States v. Mendenhall,* 446 U.S. 544, 565–566, 100 S.Ct. 1870, 1883, 64 L.Ed.2d 497, 517 (1980), spoke of the significance of both of these factors:

"The jurisprudence of the Fourth Amendment demands consideration of the public's interest in effective law enforcement as well as each person's constitutionally secured right to be free from unreasonable searches and seizures. In applying a test of 'reasonableness,' courts need not ignore the considerable expertise that law enforcement officials have gained from their special training and experience."

*United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381, 388 (1985), also spoke of the competing interests that vie for dominance:

"What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.... The permissibility of a

particular law enforcement practice is judged by 'balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' " (Citation omitted).

That same opinion went on to point out that trafficking in narcotics particularly is no ordinary crime problem but one that has assumed the dimensions of a national crisis:

"This concern is, if anything, heightened by the veritable national crisis in law enforcement caused by smuggling of illicit narcotics."

473 U.S. at 538, 105 S.Ct. at 3309. In dealing with airport stops, the Supreme Court in *United States v. Place*, 462 U.S. 696, 704, 103 S.Ct. 2637, 2643, 77 L.Ed.2d 110, 119 (1983), also alluded to the strong governmental interest in stemming the flow of narcotics:

"Because of the inherently transient nature of drug courier activity . . ., allowing police to make brief investigative stops of persons . . . on reasonable suspicion of drug-trafficking substantially enhances the likelihood that police will be able to prevent the flow of narcotics into distribution channels." (Footnote omitted).

*And see Florida v. Royer*, 460 U.S. 491, 498–499, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 237 (1983).

Counsel for the appellant observed at oral argument that the Supreme Court seems to be creating a diluted Fourth Amendment for drug prosecutions while preserving a more substantial Fourth Amendment for other types of crime. Although the comment as offered was wry, it may actually have been not far off the mark. It is, of course, not the case that the Supreme Court is creating one Fourth Amendment for drug prosecutions and another for other types of crime. It is rather the case that when the currently prevailing general reasonableness approach to the Fourth Amendment applies, as it does here, that reasonableness is determined by balancing the "intrusion on the individual's Fourth Amendment interests" against the "promotion of legitimate governmental interests."

By the very nature of the balancing process, it follows that the individual's Fourth Amendment interest does not enjoy a fixed position, as if in a vacuum chamber, but rises or falls in relationship to the countervailing interest being weighed against it. When a scourge such as narcotics assumes plague-like proportions, therefore, the governmental interest in combatting it is correspondingly weighty. The very phenomenon of balancing necessarily implies that the gravity of the governmental interest on one side of the scale will inevitably influence what happens on the other side of the scale.

The investigation of narcotics cases is not the only instance where the Supreme Court has recognized the gravity of a social problem as a factor in the weighing process. *South Dakota v. Neville*, 459 U.S. 553, 558–559, 103 S.Ct. 916, 919–920, 74 L.Ed.2d 748, 755–756 (1983) (drunken driving); *Welsh v. Wisconsin*, 466 U.S. 740, 755–756, 104 S.Ct. 2091, 2100–2101, 80 L.Ed.2d 732, 746–747 (1984) (concurring opinion by Blackmun, J.) (drunken driving); *Michigan Police v. Sitz*, 496 U.S. ——, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (drunken driving); *New York v. Class*, 475 U.S. 106, 111–112, 106 S.Ct. 960, 964–965, 89 L.Ed.2d 81, 88–89 (1986) (automobile larceny); *Delaware v. Prouse*, 440 U.S. 648, 659–661, 99 S.Ct. 1391, 1399–1400, 59 L.Ed.2d 660, 671–672 (1979) (highway safety). The balancing of the governmental interest in solving a social problem against the constitutional intrusion has also taken place with respect to the Fifth Amendment privilege against compelled self-incrimination. *California v. Byers*, 402 U.S. 424, 448, 91 S.Ct. 1535, 1547, 29 L.Ed.2d 9, 29 (1971) (concurring opinion by Harlan, J.) (hit-and-run drivers).

On the other side of the balance scale, the constraint on liberty imposed by a *Terry* stop is relatively minimal. It is limited in space in the sense that it does not involve removing the suspect from the place where he is initially stopped to some more remote location. It is limited in time in that its duration must be brief. Nothing more severe by way of constraint will happen to the suspect unless, during the

course of the brief restraint, some supervening justification should develop. Because the impact on personal liberty of the *Terry* detention itself (as opposed to its possible consequences) is minimal, the required justification is significantly less than probable cause. As was discussed in *Florida v. Rodriguez*, 469 U.S. 1, 5, 105 S.Ct. 308, 310, 83 L.Ed.2d 165, 170 (1984):

> "Certain constraints on personal liberty that constitute 'seizures' for purposes of the Fourth Amendment may nonetheless be justified even though there is no showing of 'probable cause' if 'there is articulable suspicion that a person has committed or is about to commit a crime.' ... Such a temporary detention for questioning in the case of an airport search is reviewed under the lesser standard enunciated in *Terry v. Ohio*, ... and is permissible because of *the 'public interest involved in the suppression of illegal transactions in drugs* or of any other serious crime.'" (Citations omitted) (Emphasis supplied).

The most recent (June 11, 1990) decision of the Supreme Court dealing with stop and frisk law illustrates tellingly how little is required by way of justification for a stop or a frisk. *Alabama v. White*, 496 U.S. ——, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), dealt with a stop precipitated by an anonymous telephone tip and corroborated only by police observation of several relatively innocuous details. In upholding the Fourth Amendment legitimacy of the stop, the Supreme Court observed:

> "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."

In our case, both the appellant's age [5] and his sex were compatible with the statistically-based profile of a drug

---

5. With respect to age, Corporal Thomas responded:

courier in the Washington metropolitan area. These factors, standing alone, would be so *de minimis* as to be meaningless. Even in combination with other pieces of circumstantial evidence, they are of minimal weight. They are nonetheless of *some* slight weight and are, therefore, entitled to enter into the larger totality of circumstances.[6] Both the dress of the appellant and the gold chains and gold rings worn by the appellant are data in the same category. They are virtually meaningless standing alone because thousands of innocent persons are so dressed and so adorned. They are also compatible, however, with the characteristic dress and adornment of the drug dealer, as reflected in the profile.

Any single item in this category is not purported to be self-sufficient proof of guilt or even self-sufficient evidence of either probable cause or articulable suspicion. It is simply a clue. Clues, however, are the life blood of good detective work. Clues alert the police as to where to look and when to look more closely. When clues begin to

---

"Q: Let's assume he had been 30 years old. Would that have made you more suspicious or less suspicious?
A: It would have made me a little less suspicious."

6. We are not called upon to consider the logical relevance of race as a factor in the "articulable suspicion" equation, because Corporal Thomas explicitly disclaimed any reliance upon such a factor. In response to an inquiry from the court, he explained at one point:
"If, if he were a white male driving northbound on 270 wearing the same thing that he had had that day, driving the same type of vehicle with Florida rental plates, I—and the conditions were the same, there was—there were numerous papers, I didn't see a beeper, I would still conduct myself the same way."
Following yet another inquiry from the court, he responded:
"The Court: All right. I am going to let you go in a minute I promise, Officer, but so the record is clear, you are indicating that had it been a guy, Joe Blow, in a business suit without the other paraphernalia, black guy, white guy, yellow guy, whatever, would you have taken him out of the car at all or would you have just given him a couple of tickets, one for speeding and one for—
The Witness: I would have issued a citation.
The Court: And never called for the backup?
The Witness: No. I would have run the checks, but I wouldn't have—."

accumulate and to point in the same direction, moreover, that accumulation becomes the stuff of which articulable suspicion (and even, further along the continuum, probable cause and proof of guilt) may be made. A mosaic begins to emerge from the individually insignificant little pieces of stone. The combination of gold chains and gold rings on a young man, for instance, may have a different investigative value than the combination of the same gold jewelry on an older woman, or even a younger woman.

A more significant clue was the expensive sports car. For a young man of an age suggesting that he would be still in school or newly entered into the work force to be provided with a sports car the cost of which is measured in units of tens of thousands of dollars is a clue that the police would have been derelict to overlook.[7] There, of course, could be innocent explanations, such as the young man's using of the family car. The document check showing the sports car to have been registered to the appellant himself and another of a different surname, however, at least tilted against such innocent explanation. In contemplating the range of explanations for a phenomenon worthy of their interest, the police could not ignore the more sinister possibility that the source of the appellant's precocious affluence was the narcotics traffic. It is in the weighing of that possibility that the appellant's characteristics compatible with those of a narcotics trafficker took on a significance they might not otherwise have possessed.

The clincher, especially when considered in combination with all of the other observed characteristics, was the appellant's use of the beeper. As Corporal Thomas initially looked through the driver's window, he saw a beeper lying on the center console. He observed on the passenger seat, immediately next to the appellant, various papers strewn

---

7. As Corporal Thomas explained:
   "It's kind of hard to explain, but you wouldn't normally find a young person driving a Mercedes unless it's their parents', parents' car, but for it to be registered to them, it's very unusual."

about containing apparent telephone numbers. It is not uncommon, of course, for a doctor or a lawyer to use a beeper. The appellant's age, not to mention his dress and adornment, tended to negate his membership in either of those professions. Movement in a car with both beeper and telephone numbers readily at hand is also, however, behavior consistent with the *modus operandi* of a drug dealer. In *United States v. Ceballos*, 719 F.Supp. 119, 124 (E.D.N. Y.1989), the court recognized the strong link between the use of a beeper and the narcotics traffic:

> "As Agent Whipple testified, narcotics traffickers are known to utilize pay phones and beepers in order to avoid detection by law enforcement officers. Advances in technology now enable traffickers to communicate times, dates, locations, prices, and quantities for narcotics transactions via codes to other beepers.
>
> Courts have recently come to recognize 'beeper calls' as one indication that drug trafficking 'may be afoot.' ... In *Hoyos* the Ninth Circuit recognized that '[n]arcotics dealers in Los Angeles County use beepers and public telephones in plying this illicit trade.' ... This court has now heard ample testimony and received in evidence a sufficient number of beepers in many cases to confirm that Eastern District of New York narcotics dealers use much the same beeper techniques as their West Coast colleagues. Of this fact of life in the world of narcotics, we take judicial notice." (Citations omitted).

The West Coast case referred to by *United States v. Ceballos*, was *United States v. Hoyos*, 868 F.2d 1131 (9th Cir.1989). In *Hoyos*, the Ninth Circuit held that certain evidence was legally sufficient to prove that Hoyos was a knowing participant in a conspiracy to distribute narcotics. A significant factor was Hoyos' placing of "beeper" telephone calls, as the court observed, at 1136:

> "In addition, Hoyos made 'beeper' telephone calls from public telephone booths. Narcotics dealers in Los Angeles County use beepers and public telephones in plying their illicit trade.

The officers involved in this matter had many years of experience investigating illegal narcotics transactions. Hoyos' conduct had special significance in their eyes. 'Conduct which appears innocent to a lay person may have an entirely different significance to an experienced narcotics officer.' "

*See also United States v. Ginsberg,* 758 F.2d 823, 829 (2d Cir.1985) (In affirming a conviction for the possession of narcotics with intent to distribute, the court gave significant evidentiary weight to the defendant's possession of a telephone beeper, telephone numbers and a business card containing the access number of a co-conspirator's beeper); *United States v. Cruz,* 834 F.2d 47, 48 (2d Cir.1987) (In affirming a conviction for conspiracy to distribute cocaine, the court gave weight to an agent's testimony "that in his experience, calling beepers is a very common practice among narcotics dealers").

In resolving any doubt between whether the beeper in this case was being used by a doctor or a lawyer for instance, on the one hand, or by a narcotics dealer, on the other hand, the cumulative impact of the appellant's age, the appellant's sex, the appellant's dress, the appellant's gold chains and gold rings, the appellant's possession of an expensive sports car unusual for one of his age, and the loose papers on the passenger seat bearing telephone numbers assumed a meaningful significance. To suggest that all of this did not establish the minimal articulable suspicion needed to justify a brief detention for further inquiry is untenable.

The tell-tale combination of individually innocuous factors will frequently have special significance for law enforcement officers. As was observed in *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981):

"The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a

trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."

In *United States v. Sokolow, supra,* the Court of Appeals for the Ninth Circuit had deemed unreasonable the finding of articulable suspicion from a combination of probabilistic factors such as those in this case, holding that each one alone was compatible with innocence and that it is required that there be at least one factor indicating then-ongoing criminal activity. The Supreme Court reversed the Ninth Circuit and reinstated the legitimacy of the finding of articulable suspicion on the basis of probabilistic factors alone, holding 490 U.S. at ——, 109 S.Ct. at 1587, 104 L.Ed.2d at 12:

" '[I]nnocent behavior will frequently provide the basis for a showing of probable cause,' and ... '[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts.' *That principle applies equally well to the reasonable suspicion inquiry.*" (Emphasis supplied).

Articulable suspicion was established for the superseding *Terry* stop here.

## THE PURPOSE OF THE STOP WAS LEGITIMATE

■ In broadest terms, the purpose of the stop, of course, was to verify or to dispel the initial suspicion that the appellant was trafficking in narcotics. A garden-varie-

ty way of verifying or dispelling suspicion is to question the suspect and, perhaps, to examine his identification. In this case, Corporal Thomas requested a drug-sniffing dog to assist in the verifying or dispelling process. That that is a legitimate modality for conducting a *Terry* stop was established by *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 2644–2645, 77 L.Ed.2d 110, 121 (1983):

> "[T]he canine sniff is *sui generis*. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here— exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a 'search' within the meaning of the Fourth Amendment."

In *Place*, the use of the canine was the central feature of the *Terry* stop and the Supreme Court squarely placed its seal of approval upon the technique.

What we do not know, of course, because supervening events took over before the dog arrived, was whether the dog was supposed to sniff the appellant, to sniff the exterior of the appellant's automobile,[8] or to sniff both. If the intended purpose of the stop, in whole or in part, were to have the dog sniff the appellant's automobile, one question naturally arises. The cases are legion, of course, holding that a suspect himself may be detained for a brief period of time for purposes of verifying or dispelling the initial suspicion. What is not so well-settled is whether the personal property of the suspect may similarly be detained for such a purpose.

---

**8.** As already discussed, there would be no problem with the sniffing by a trained dog of the exterior of an automobile or of the exterior of any other item of personal property. Since the sniffing never took place, we are not called upon to address the scope problem that might arise if a drug-sniffing dog were used to sniff the *interior* of an automobile that had been opened for that purpose. We intimate nothing in this regard.

Once again, the answer has been supplied by *United States v. Place, supra.* That case broke new ground in holding that a suspect's suitcase, as opposed to the suspect himself, could be briefly detained under the authority of *Terry v. Ohio.* It held, 462 U.S. at 702, 103 S.Ct. at 2642:

"In this case, the Government asks us to recognize the reasonableness under the Fourth Amendment of warrantless seizures of personal luggage from the custody of the owner on the basis of less than probable cause, for the purpose of pursuing a limited course of investigation, short of opening the luggage, that would quickly confirm or dispel the authorities' suspicion. Specifically, we are asked to apply the principles of *Terry v. Ohio* ... to permit such seizures on the basis of reasonable, articulable suspicion, premised on objective facts, that the luggage contains contraband or evidence of a crime. In our view, such application is appropriate."

The present case, of course, involves an automobile rather than a suitcase, but we see no principled distinction between the two. As *United States v. Place* broke new ground, it abrogated any distinction between the seizure of a person and the seizure of personalty. We do not see any subcategorization within the species "personalty" that would call for any differences in treatment. What the Supreme Court said with respect to luggage, at 462 U.S. 703, therefore, would apply with equal logic to an automobile:

"The Government contends that, where the authorities possess specific and articulable facts warranting a reasonable belief that a traveler's luggage contains narcotics, the governmental interest in seizing the luggage briefly to pursue further investigation is substantial. We agree. As observed in *United States v. Mendenhall,* ... *'[t]he public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit.'* " (Citation omitted) (Emphasis supplied).

## ARTICULABLE SUSPICION FOR THE FRISK OF THE APPELLANT

■ Once it is established that there is articulable suspicion for a stop, consideration turns to whether there is also articulable suspicion for an attendant frisk. *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889, 909 (1968), explained both the compelling purpose and the minimal justification required to take this important step to protect the life and limb of the stopping officer:

"[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. *The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."* (Emphasis supplied).

We hold that "a reasonably prudent man" in the circumstances of this case, a one-on-one confrontation with a suspected drug dealer on a rural highway, "would be warranted in the belief that his safety ... was in danger." Corporal Thomas, indeed, articulated just such a belief. When the backup trooper arrived, Corporal Thomas indicated to him his belief that the appellant might be armed and his intention to conduct a pat-down search. Corporal Thomas testified that that belief was based, in part, upon the local drug courier profile, which warned that persons fitting the profile will frequently be in possession of weapons.

The appellant doggedly insists that the combination of a young male driving an expensive sports car, wearing gold jewelry, and possessing both a beeper and telephone numbers, etc., does not yield articulable suspicion that such an individual is armed. The appellant, however, asks the wrong question, as he ignores an important intermediate

step. We have passed the stage where we assess those characteristics as if for the first time. It has already been established that Corporal Thomas had good cause to believe that the appellant was a drug dealer. The pertinent and significantly different question then becomes, "Was there articulable suspicion to believe that *a suspected drug dealer* might be armed?" That question proceeds from a higher plateau.

The case law holds that sometimes the suspected crime itself can, *ipso facto*, afford articulable suspicion that the suspected criminal may be armed. In dealing with the stop of a suspected armed robber in *Terry* itself, Justice Harlan, in his concurring opinion, concluded that the suspected armed robbery automatically supplied the justification for the attendant frisk. He reasoned, 392 U.S. at 33, 88 S.Ct. at 1886:

> "Where such a stop is reasonable, however, the right to frisk must be immediate and automatic if the reason for the stop is, as here, an articulable suspicion of a crime of violence.
>
> .    .    .    .    .
>
> Officer McFadden had no probable cause to arrest Terry for anything, but he had observed circumstances that would reasonably lead an experienced, prudent policeman to suspect that Terry was about to engage in burglary or robbery. . . . When he did, he had no reason whatever to suppose that Terry might be armed, apart from the fact that he suspected him of planning a violent crime."

*See also United States v. Castillo,* 866 F.2d 1071, 1080–1081 (9th Cir.1988) (police could rely on their knowledge from experience that drug dealers carry guns and resort to violence).

Judge Rodowsky, in *Simpler v. State,* 318 Md. 311, 318, 568 A.2d 22 (1990), recently made the same analysis and reached the same conclusion:

"The suspected criminal activity itself can furnish the dangerousness justifying a frisk following a *Terry* stop. Professor La Fave puts it this way:

'It is undoubtedly true, however, that in some cases the right to conduct a protective search must follow directly from the right to stop the suspect. The Court seems to take this view in *Terry*, although Justice Harlan's concurring opinion proceeds to "make explicit what I think is implicit" in the majority opinion, namely, that "the right to frisk must be immediate and automatic if the reason for the stop is, as here, an articulable suspicion of a crime of violence." *Lower courts have been inclined to view the right to frisk as being "automatic" whenever the suspect has been stopped upon the suspicion that he has committed, was committing, or was about to commit a type of crime for which the offender would likely be armed,* whether the weapon would be used to actually commit the crime, to escape if the scheme went awry, or for protection against the victim or others involved. *This includes such suspected offenses as* robbery, burglary, rape, assault with weapons, homicide, and *dealing in large quantities of narcotics.*'

3 La Fave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.4(a), at 505–06 (1987)." (Emphasis supplied).

Here, the suspected offense involved "dealing in large quantities of narcotics." The articulable suspicion for the frisk followed from the very nature of the suspected crime.

## THE GEOGRAPHIC SCOPE OF THE FRISK

██ Once again, to get the right answer, it is necessary to ask the right question. The appellant asks whether there was articulable suspicion to believe that the car might be armed. The pertinent question, however, already answered in the affirmative, was whether there was articulable suspicion to believe that the appellant might be armed.

The entry into the car was simply the coincidental by-product of the frisk of the appellant.

In a doctrinal sense, there was no car search as such in this case, except in the most coincidental way. Every search that intrudes into a car is not necessarily a car search. In terms of constitutional algebra, what happened was that some of the cubic footage of air space within the appellant's automobile happened to fall within the appellant's *"Chimel* perimeter"—his wingspread or wingspan— the danger zone within which he might be able physically to reach, lunge, or grasp for a weapon. The epicenter from which we measure is the appellant, not his car.

The issue now before us is not, therefore, whether there was justification for a search, even a limited frisk, of the appellant's car. The justification for the frisk of the appellant having already been established, the pertinent issue before us rather is the permitted geographic scope—the range in space—of that frisk.

Involved in the analysis are two parallels, one of the first and the other of the second generation. Supporting the parallels are 1) secondarily, the case law and 2) primarily, the overarching logic of the parallels themselves. The first parallel is between the respective scopes of a search incident to lawful arrest and a frisk. The permitted scope of any search, of course, is whatever is necessary to serve the purpose of that search, but not one bit more. The search incident serves two purposes: 1) to prevent the destruction by the arrestee of accessible evidence and 2) to prevent the arrestee from harming the arresting officer with an available weapon. The single purpose of the frisk is precisely the same, in all pertinent respects, as that second purpose of the search incident. It is to prevent the stoppee from harming the stopping officer with an available weapon.

Because the search incident possesses one purpose—the prevention of the destruction of evidence—not shared by the frisk, it may be more intensive in scope. It may probe into wallets and pockets and other places where a lottery slip or a glassine bag could easily be concealed. The frisk,

on the other hand, is restricted in intensity to a pat-down of the exterior of the clothing surface. That is enough to detect the presence of a weapon and that, therefore, is all that is permitted in terms of the intensity of the search.

When it comes to the very different scope problem of how extensive a search may be, however, the search incident and the frisk require coterminous search perimeters. The ability of a suspect to reach, lunge, or grasp for a weapon is a constant, whether his status is that of an arrestee or a stoppee. The vulnerability of the officer to the weapon is a constant, whether his function of the moment is that of an arresting officer or that of a stopping officer. When the danger zones are coterminous, the prerogatives of the officer to take preventive or preemptive measures must be similarly coterminous. In *Williams v. State,* 19 Md.App. 204, 213–214, 310 A.2d 593 (1973), we analyzed at some length the indistinguishable scope issues, in terms of how extensive they needed to be:

"The second purpose of the 'search incident,' however, is shared by the 'frisk.' That purpose is to protect the officer by neutralizing all potentially available weapons. *Closson v. Morrison,* 47 N.H. 482 (1867). It follows ineluctably from that common purpose that the range in space of preventive police activity is coextensive in the 'search incident' situations and in the 'frisk' situations. To serve the purpose giving birth to the exception in the first place, it is as necessary to the 'frisk' as to the 'search incident' to define the perimeter of permitted police activity as that area within 'the lunge,' 'the grasp,' 'the reach' of the suspect—that area 'which may fairly be deemed to be an extension of his person.' *United States v. Rabinowitz,* 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950) (dissenting opinion by Frankfurter, J.); *Chimel v. California, supra* [395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) ]; *Brown v. State, supra* [15 Md.App. 584, 292 A.2d 762 (1972) ]. Whether the police are arresting a suspect or are temporarily detaining him for questioning, the potential ability of the suspect to grab for a weapon is a constant factor. Although the 'search inci-

dent' may be more intensive than the 'frisk,' the two will be, perforce, equally extensive.

Applying that standard, we hold that the bag on the floor of the automobile, which seconds before had been seen between the feet of this suspected holdup man and which still was within a few feet of him as he stood immediately outside the opened car door, fell within that perimeter of a reasonable 'frisk.' The 'frisk' needs to be as ranging in extent as the danger it was designed to prevent. The reason which gives birth to the exception defines its extent."

The second generation parallel is between the treatments of these respective perimeters of permitted police activity when they arguably embrace part or all of an automobile which the suspect, be he arrestee or stoppee, is then occupying or standing just outside. In both instances, the Supreme Court has decided to forego any attempt to measure the actual reach, lunge, or grasp into some or all of the automobile's interior on a case-by-case basis. In both instances, the Supreme Court has opted instead for a bright-line formula treating the entire passenger compartment as falling within the danger zone, without requiring any demonstration that it necessarily does so in the case at hand.

The Supreme Court first addressed the problem in the context of search incident law. *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), although involving a physical intrusion into an automobile, was exclusively a search incident case:

"When the occupant of an automobile is subjected to a lawful custodial arrest, does the constitutionally permissible scope of a search incident to his arrest include the passenger compartment of the automobile in which he was riding?"

453 U.S. at 455, 101 S.Ct. at 2861. The Supreme Court pointed out, 453 U.S. at 460, 101 S.Ct. at 2864, the extreme difficulty of measuring the *Chimel* search incident perimeter when it arguably includes part or all of an automobile:

"While the *Chimel* case established that a search incident to an arrest may not stray beyond the area within the immediate control of the arrestee, courts have found no workable definition of 'the area within the immediate control of the arrestee' when that area arguably includes the interior of an automobile and the arrestee is its recent occupant. Our reading of the cases suggests the generalization that articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within 'the area into which an arrestee might reach in order to grab a weapon or evidentiary ite[m].' ... In order to establish the workable rule this category of cases requires, we read *Chimel*'s definition of the limits of the area that may be searched in light of that generalization. Accordingly, we hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." (Citation and footnotes omitted).

*New York v. Belton* did not create any special rule or any new search incident law. It simply handled the problem of measuring the *Chimel* perimeter when it arguably intrudes into an automobile by using a standardized approach. It is nothing more than a tool for measuring the boundaries of the reach, lunge, or grasp perimeter in this special setting:

"Our holding today does no more than determine the meaning of *Chimel*'s principles in this particular and problematic context. It in no way alters the fundamental principles established in the *Chimel* case regarding the basic scope of searches incident to lawful custodial arrests."

453 U.S. at 460 n. 3, 101 S.Ct. at 2864 n. 3.

*Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), addressed precisely the same question of measuring the boundary of the frisk perimeter when it overlapped some or all of an automobile:

"We granted *certiorari* in this case to consider the important question of the authority of a police officer to protect himself by conducting a *Terry*-type search of the passenger compartment of a motor vehicle during the lawful investigatory stop of the occupant of the vehicle."

463 U.S. at 1037, 103 S.Ct. at 3474. By parity of reasoning and by express reference to *Belton,* the Supreme Court handled the problem precisely the same way. It pointed out that there is no reason to take less by way of preventive action with a stoppee than with an arrestee, noting 463 U.S. at 1050, 103 S.Ct. at 3481:

"If a suspect is 'dangerous,' he is no less dangerous simply because he is not arrested."

It first had to bring the scope analysis of a frisk up to date with the scope analysis of a search incident. It acknowledged that in *Terry v. Ohio,* "We did not, however, expressly address whether such a protective search for weapons could extend to an area beyond the person in the absence of probable cause to arrest." 463 U.S. at 1034, 103 S.Ct. at 3473. The defendant in *Long* argued, as the appellant here seems to argue, that a frisk is confined to the body of a suspect and does not embrace the surrounding area:

"The court below held, and respondent Long contends, that Deputy Howell's entry into the vehicle cannot be justified under the principles set forth in *Terry* because '*Terry* authorized only a limited pat-down search of a *person* suspected of criminal activity' rather than a search of an area." (Emphasis in original).

463 U.S. at 1045, 103 S.Ct. at 3479. The Supreme Court, 463 U.S. at 1047, 103 S.Ct. at 3480, squarely rejected such a limitation on the geographic scope of the frisk:

"Contrary to Long's view, *Terry* need not be read as restricting the preventative search to the person of the detained suspect." (Footnote omitted).

The danger that the stoppee poses to the stopping officer may be from access to weapons nearby even though not carried on his person:

"[W]e have also expressly recognized that suspects may injure police officers and others by virtue of their access to weapons, even though they may not themselves be armed."

463 U.S. at 1048, 103 S.Ct. at 3480. The Supreme Court discerned no difference in danger from a weapon on the stoppee's person and a weapon in his nearby automobile:

"Just as a *Terry* suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect in Long's position break away from police control and retrieve a weapon from his automobile."

463 U.S. at 1051, 103 S.Ct. at 3482.

The Supreme Court then formulated the *Terry-Long* analogue to the *Chimel-Belton* combination. It pointed out that *Chimel* had relied on *Terry* and how *Belton* was the logical result of applying *Chimel* to the automobile setting:

"Relying explicitly on *Terry*, we held that when an arrest is made, it is reasonable for the arresting officer to search 'the arrestee's person and the area "within his immediate control"'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.' ... In *New York v. Belton*, ... we determined that the lower courts 'have found no workable definition of "the area within the immediate control of the arrestee" when that area arguably includes the interior of an automobile and the arrestee is its recent occupant.' ... In order to provide a 'workable rule,' ... we held that 'articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within "the area into which an arrestee might reach in order to grab a weapon."'" (Citations omitted).

463 U.S. at 1048–1049, 103 S.Ct. at 3480.

The marriage between *Chimel-Belton* and *Terry-Long* was then consummated, 463 U.S. at 1049, 103 S.Ct. at 3481:

"These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." (Footnote omitted).

The appellant makes too much of the fact that the officers in *Michigan v. Long* spotted a large hunting knife on the floor of Long's automobile before engaging in the frisk. The spotting of the hunting knife was not some incremental justification required to move a frisk from the person of the suspect to the more far-flung reaches of the suspect's wingspan, including the passenger compartment of his automobile. The spotting of the hunting knife in *Long* was the only articulable suspicion the police had for any frisk at all, person and automobile interior alike. The frisk is a single phenomenon requiring a single justification. There is no additional justification required to move from the heartland of a frisk to its hinterland.

That *Terry-Long* is the analogue of *Chimel-Belton* was expressly acknowledged by the Court, 463 U.S. at 1049 n. 14, 103 S.Ct. at 3481 n. 14:

"What we borrow now from *Chimel v. California,* ... and *Belton* is merely the recognition that part of the reason to allow area searches incident to an arrest is that the arrestee, who may not himself be armed, may be able to gain access to weapons to injure officers or others nearby, or otherwise to hinder legitimate police activity. This recognition applies as well in the *Terry* context." (Citation omitted).

The Supreme Court reasoned that *Michigan v. Long* was simply the logical extension of *Terry, Chimel,* and *Belton:*

"[T]he reasoning of *Terry, Chimel,* and *Belton* points clearly to the direction that we have taken today. Although *Chimel* involved a full custodial arrest, the ratio-

nale for *Chimel* rested on the recognition in *Terry* that it is unreasonable to prevent the police from taking reasonable steps to protect their safety."
463 U.S. at 1052 n. 16, 103 S.Ct. at 3482–83 n. 16.

The frisk in this case did not exceed its permitted bounds.

## A PLAIN VIEW DOCTRINE SEIZURE

■ The only base that remains to be touched is home plate. Even as the frisk of the passenger compartment was getting underway, a superseding Fourth Amendment doctrine came into play. While the appellant was standing a few feet away from his automobile in response to Corporal Thomas' order that he alight, the driver's door remained open at all times. After patting down the appellant, Corporal Thomas turned to look into the vehicle.[9] As he leaned the upper part of his body through the already opened door, he was looking directly down at the driver's seat and at the console that separated the two front bucket seats from each other. Resting between the driver's seat and the console was the transparent cellophane bag and its visible contents of numerous smaller glassine bags, each containing white powder.

Corporal Thomas then seized them warrantlessly under the authority of the Plain View Doctrine. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); *Horton v. California*, 495 U.S. ——, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). All of the necessary conditions were in place. The entry into the automobile for the purpose of the extended frisk was a prior valid intrusion. *Michigan v. Long, supra*. Following that valid intrusion, the contraband was spotted in plain view. The glas-

---

**9.** Corporal Thomas explained that he was looking for weapons:
   "As I looked straight down, for instance, using this as his seat, I looked along this area to check to see if there were any—if I could see any handles of any type of weapons or knives or what have you before I allowed him to sit back in his [car]."

sine bags full of white powder themselves then provided the probable cause to believe that they were contraband.[10]  *A fortiori*, they did so in conjunction with the beeper, the telephone numbers, and the other tell-tale characteristics of the local drug courier profile.  The warrantless seizure was, therefore, constitutional.

JUDGMENT AFFIRMED;  COSTS TO BE PAID BY APPELLANT.

---

**10.**  Corporal Thomas testified:
"[B]etween the driver's seat and the center console I observed what appeared to be a cellophane bag that had what looked like individual cellophane bags of narcotic substance."