612 A.2d 339

**STATE of Maryland**

v.

**Ricky DARDEN.**

No. 278, Sept. Term, 1992.

Court of Special Appeals of Maryland.

Sept. 9, 1992.

Certiorari Denied Nov. 10, 1992.

374

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellant.

Donald Edward Ansell and Donna L. Seeley, Upper Marlboro, for appellee.

Submitted before ALPERT, BLOOM and DAVIS, JJ.

DAVIS, Judge.

Ricky Darden, appellee, was indicted on September 9, 1991, on two counts of possession with intent to distribute a controlled dangerous substance, one count of possession of a controlled dangerous substance, and one count of transporting a handgun. On September 25, 1991, Darden filed a motion to suppress evidence, and a January 21, 1992 evidentiary hearing followed in the Circuit Court for Prince

George's County.  In a memorandum opinion filed on February 19, 1992, the trial court granted Darden's motion. The State now seeks our review, asserting that the trial court erroneously granted Darden's motion.  We issued an order on August 12, 1992, affirming the order of the Circuit Court for Prince George's County.  We now explain.

## FACTUAL BACKGROUND

On August 20, 1991, at approximately 1:50 p.m., Ricky Darden, in the midst of approximately fifteen to twenty people, disembarked from a train arriving at the New Carrollton Metro Station in Prince George's County from New York City.  He caught the attention of Officers T.N. Mallory and Thomas J. Call as he proceeded past them on the platform and then down the escalator to the mezzanine level, at which time, according to Mallory at the suppression hearing, he followed Darden to the exit of the Amtrak subway station.  There, Mallory approached Darden, identified himself as a Metro Transit Police Officer, and requested to speak with him.  According to Mallory, Darden had made eye contact with him four times—three times looking over his left shoulder and once over his right shoulder.  As Darden proceeded down the escalator, glancing at the Metro policemen, "he was very nervous and started to shake." He then looked over his left shoulder and was observed shaking.

Darden agreed to speak with Mallory, whereupon Mallory advised him that he and his partner were conducting drug interdiction "to stop the illegal flow of narcotics coming from New York City into the metropolitan area."  Mallory observed that Darden "was sweating profusely at that time from his forehead and that he was shaking."  It was his opinion that the perspiring was inconsistent with the temperature in the Metro station at the time.  When asked for his train ticket, Darden replied that he didn't have one, at which time Mallory "advised him that he needed a ticket to ride the Amtrak train."

After producing his wallet from a pants pocket, Darden "start[ed] to fumble in his wallet for the ticket." The witness opined that Darden appeared to have problems locating his ticket, he was very nervous, his hands were shaking, and "he had trouble getting anything out of his wallet." Darden handed the ticket to Mallory and, after observing that Darden had boarded the train at Penn Station in New York City, the police officer returned the ticket to Darden, inquiring if he had purchased the ticket. Darden advised him that his mother had paid for the ticket.

When asked his name, the appellee identified himself as Ricky Darden and then, when requested, spelled his last name D–A–R–D–O–N. Darden then produced identification in the form of an unofficial laminated ID card on which the name indicated was Ricky Darden with the last name spelled D–A–R–D–E–N. The identification card was returned to the appellee, and he was next questioned about his destination, whereupon he stated he was going to 18408 London Lane in Bowie, Maryland. When questioned further, Darden indicated that he was not carrying any large amounts of money or drugs on him or in his bag. Mallory then asked Darden for permission to search his bag; according to Mallory, the appellee gave his consent.

As Mallory began to open up the center pouch of the gym bag, appellee went over to Officer Call and asked, "Did I [Mallory] have to look in the bag?" Upon being advised that Mallory could only search the bag if he had Darden's consent, appellee stated that he did not want the officers to look in the bag, at which point Mallory stopped. Before he was able to fasten the zipper, however, Darden "grabbed the handles of the bag and tried to walk off very quickly." Mallory grabbed the bag and told Darden that he was temporarily detaining the bag in order to call a narcotics detection dog to "do the exterior inspection of the bag." Darden was free to go or stay, as he chose, until the dog arrived and inspected the bag. Appellee was advised that it would be somewhere between ten to twenty minutes before the dog arrived and, if the dog did not indicate the presence

of narcotics, the bag would be returned if appellee would provide the officers with an address and a phone number where he could be located. The address Darden gave them was 18408 London Lane.

According to Mallory, the narcotics detection dog arrived approximately twenty minutes later.[1] The drug-sniffing dog, Wolf, conducted an exterior inspection and indicated the presence of a controlled dangerous substance by scratching the bag vigorously. Following the dog's reaction, the officers took the bag to a Prince George's County police station and prepared an application for a warrant to search the bag. Once the application was completed, Mallory called Assistant State's Attorney Kathy Evans, who approved the warrant application after it had been read to her over the telephone. Mallory then learned that Judge Devlin was on duty that evening and went to his home, where Mallory attested, under oath, to the facts in the affidavit. Mallory affixed his signature, and the judge signed the warrant, returning it to Mallory.

The officer returned to the police station with the warrant and searched the bag, discovering 223.9 grams of suspected cocaine. The substance field-tested positive for cocaine, and Mallory prepared an arrest warrant for Darden. Mallory then went to the commissioner's office and had Darden charged with possession with intent to distribute.

The next day Mallory and other officers attempted to arrest Darden at the address he had given and discovered that there was no house at the address given. Through a BMW automobile registered in his name, police tracked Darden to 14808 London Lane, where they observed Darden leaving the residence at approximately 11:00 a.m., carrying a green paper bag and a plastic bag. Darden entered a

---

1. The record of the proceedings indicates that the initial confrontation between the appellee and the police occurred at approximately 1:50 p.m., and the narcotics detection dog arrived at approximately 2:20 p.m., or thirty minutes after Darden was first accosted.

waiting taxi cab and departed. The officers, who were in unmarked vehicles, pursued and arrested Darden when the cab stopped at a Camp Springs apartment complex. Police recovered a loaded 9mm handgun and a triple-beam scale from the green paper bag. A loaded .25 caliber gun was recovered from the other bag.

Officer Tommy Call was the final witness to testify concerning the incident, and he related facts identical to those given by Officer Mallory.

## LEGAL ANALYSIS

The Fourth Amendment to the United States Constitution provides:

*[Security from Unwarrantable Search and Seizure]*

The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The constitutional right against unreasonable searches and seizures is made applicable to the States through the Fourteenth Amendment and is specifically applicable to State prosecutions by the Supreme Court's decision in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

The appellee, citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968), acknowledges that it is permissible for an investigating officer to "briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulated facts that criminal activity 'may be afoot' even if the officer lacks probable cause." Appellee contends that "no reasonable articulable suspicion supported the seizure of Darden's bag" and that the court was therefore correct in its finding that the State's remaining evidence must be suppressed because it "was the direct result of the unlawful seizure." The State

replies that the trial court's ruling is erroneous because there was articulable suspicion of criminal activity to justify the seizure of the bag. Assuming, *arguendo*, the bag was illegally seized, the State alternatively contends that the subsequent actions of the police officers were based upon the good faith exception that they were acting pursuant to a valid search warrant.

The lower court, in its memorandum opinion, determined that the initial confrontation in questioning of the appellee was constitutionally permissible because "it would appear to a reasonable person in [appellee's] position, that he had a right, at any time, to terminate the questioning and leave," citing *U.S. v. Mendenhall*, 446 U.S. 544, 546, 100 S.Ct. 1870, 1873, 64 L.Ed.2d 497 (1980). The court further observed that appellee's constitutional rights were not violated when the initial search commenced because it was pursuant to the consent obtained. Concerning the initial seizure of the appellee's sports bag, the lower court considered six factors relevant to the inquiry:

> To summarize, at the time Officer Mallory detained the bag, the Officer knew the following: (1) defendant had been a passenger on a train which had come from a "source city"; (2) from the time defendant got off the train until the time the bag was seized, defendant was agitated and nervous; (3) that defendant, before producing identification, had misspelled his surname; (4) that defendant had falsely said he did not have a ticket; (5) that defendant had withdrawn his consent to the search immediately upon being made aware of his right to refuse consent; and (6) that although he had searched the bag for a minute he had not found anything incriminating in it.

The court's memorandum opinion continues by adverting to the principle that, subject only to a few exceptions, the seizure of a person's property is *per se* unreasonable under the Fourth Amendment when such seizure is not conducted pursuant to the authority of a warrant supported by proba-

ble cause. *Riddick v. State,* 319 Md. 180, 571 A.2d 1239 (1990).

Finding that there was not a reasonable articulable suspicion to warrant a narcotics-related detention, the lower court granted appellee's motion to suppress.

## STANDARD OF REVIEW

■ We have set forth the factual findings made by the judge on the motion to suppress because we are mandated, when the facts are in dispute, to accept them as found by the trial judge unless he is clearly erroneous in his judgment on the evidence before him. *Riddick,* 319 Md. at 183, 571 A.2d 1239. Our determination as to whether he is clearly erroneous requires us to give due regard to the opportunity of the trial court to judge the credibility of the witnesses. Md.Rule 8–131(c).

■ Notwithstanding the requirement that we defer to the findings of fact of the trial judge on the motion to suppress, when the question is whether a constitutional right has been violated, we must make our own independent constitutional appraisal by reviewing the law and applying it to the peculiar facts of the particular case. *Riddick,* 319 Md. at 183, 571 A.2d 1239; *State v. Gee,* 298 Md. 565, 571, 471 A.2d 712 (1984).

## REASONABLE ARTICULABLE SUSPICION

■ As noted above, the Fourth Amendment prohibits the search and/or seizure of a person or the issuance of a warrant to search the person or the effects of a person "but upon probable cause." Succinctly put, probable cause is defined as "a fair probability that contraband or evidence of a crime will be found in a particular place." *Malcolm v. State,* 314 Md. 221, 550 A.2d 670 (1988), citing *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (citations omitted). In *Terry v. Ohio, supra,* the Supreme Court announced a standard less stringent than probable cause under which a police officer may conduct a field

interview and a limited search of a suspect. Under *Terry*, a reasonable articulable suspicion is required before an officer is authorized to detain a citizen to confirm or dispel his suspicion of the citizen's involvement in criminal activity. *Id.* In *Graham v. State*, 325 Md. 398, 406, 601 A.2d 131 (1992), quoting *Florida v. Bostick*, 501 U.S. ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991), the Court of Appeals noted that

> "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if he is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." [Citations omitted.]

█ In the case before us, both sides agree, and we concur, that the Fourth Amendment was not implicated until such time as Officer Mallory exercised dominion and control over Darden's bag and refused to allow him to leave with it.[2] Until that moment, the encounter between Darden and the officers, as evident from the testimony given, was purely consensual. The principal focus of this appeal is whether the police officers had a reasonable articulable suspicion that Darden's bag contained contraband when they seized it. We hold that they did not satisfy the requisites of a *Terry* stop, and we now explain.

The Supreme Court discussed reasonable articulable suspicion in *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), a case involving the so-called "drug-courier profile." The petitioner in *Reid* flew into Atlanta and, as he walked through the airport, glanced back occasionally at a second man. The men, who both carried shoulder bags, were stopped by police and asked for identi-

---

2. "Only when the officer, *by means of physical force or show of authority, has in some way restrained the liberty of a citizen* may we conclude that a 'seizure' has occurred." *Watkins v. State*, 288 Md. 597, 610, 420 A.2d 270 (1980) (emphasis in original), quoting *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16.

fication. Though they consented to a search of their persons and shoulder bags, the petitioner tried to run away but was apprehended. The Georgia Court of Appeals held that the evidence against the petitioner should not be suppressed, finding that the investigatory stop was valid because he fit the "drug-courier profile."

The Supreme Court reversed the state court and held that the petitioner's actions did not warrant a *Terry*-type investigatory stop because the police officers lacked a reasonable articulable suspicion of criminal activity. The Court said the circumstances present in *Reid* would "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures." *Reid*, 448 U.S. at 441, 100 S.Ct. at 2754. The Court discounted the following circumstances: that Reid flew in from a principal source city; that he arrived early in the morning, "when law enforcement activity is diminished"; and that he had no luggage other than a shoulder bag. *Id.* The Court also was not swayed by the fact that Reid and his traveling companion appeared nervous during conversations with drug agents and were visiting Ft. Lauderdale only for one day. The Court concluded that "the agent could not, as a matter of law, have reasonably suspected the petitioner of criminal activity on the basis of these observed circumstances." *Id.*

Although the instant case was not decided on the basis of the drug courier profile, *Reid* is instructive in its teaching that "more [is] required than the presence of drug courier profile characteristics." *United States v. Haye*, 825 F.2d 32, 34 (4th Cir.1987). Other factors also must be present sufficient to arouse a "particularized suspicion" that the defendant is engaging in criminal activity.

Invocation of a *Terry* stop for brief periods when there is a reasonable, articulable suspicion is an appropriate investigatory tool, as explicated in *United States v. White*, 890 F.2d 1413 (8th Cir.1989). In *White*, the defendant, who was arrested in an airport, was convicted of possession of cocaine with intent to distribute. Police made an investigato-

ry stop because White appeared nervous; he was clutching his carry-on bag under his arm as he deplaned; he was traveling from a source city; he had arrived early in the morning; he had purchased a one-way ticket with cash; and the flight he was on had previously yielded arrests of narcotics traffickers. When police asked for permission to search his luggage, the defendant declined to give his consent. The defendant asked to leave, and the officers responded that he could leave but that he could not take his luggage with him. Police brought a drug-sniffing dog to the scene *about one minute* after the defendant was told he could not take his luggage. The dog "alerted" to the carry-on bag, and police obtained a warrant to search it and found a package containing cocaine. The Court wrote that

> even if White was at all times free to leave, officers must have a *reasonable, articulable suspicion* to justify detention of a person's luggage, just as they must have to detain the person himself.... The officers confronting White, therefore, needed sufficient grounds to form a *reasonable, articulable suspicion* of criminal activity in order to detain White's bags.

*Id.* at 1416 (emphasis added).

The Court held that the officers lacked sufficient justification to detain either White or his luggage. It said:

> Without having any advance information that suggested "criminal activity may be afoot," *Terry, supra,* 392 U.S. at 30, 88 S.Ct. at 1884, or that pointed to someone matching White's description, the officers relied on the sort of "fragmentary facts" that the Supreme Court rejected as a valid basis for the investigative stop in *Reid [v. Georgia,* 448 U.S. 438, 442 n. 1, 100 S.Ct. 2752, 2755 n. 1, 65 L.Ed.2d 890 (1980)].

*Id.* at 1419.

■ Numerous federal cases have considered when sufficient factors exist to satisfy the reasonable articulable suspicion standard. A police officer's hunch or intuitive belief is not sufficient to establish a reasonable articulable

suspicion; there must be some "particularized suspicion about the individual." *United States v. Millan*, 912 F.2d 1014, 1017 (8th Cir.1990). The courts, in deciding whether a reasonable articulable suspicion exists, do not focus on singular isolated facts but "upon the totality of the circumstances." *United States v. Grant*, 920 F.2d 376, 385 (6th Cir.1990), citing *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). *See United States v. Whitehead*, 849 F.2d 849, 858 (4th Cir.1988) ("[W]e cannot engage in piecemeal refutation of each individual factor as being consistent with innocence. It is the entire mosaic that counts, not single tiles.")

In the instant case, the officers said their suspicions were aroused because the appellee, who had arrived aboard a train from New York, a source city for narcotics, made repeated eye contact with them. When police stopped the appellee, they said he appeared nervous and began "shaking" and "sweating profusely." The appellee told police he did not have a train ticket but then produced one when reminded by the officers that he needed a ticket to ride the train, and, when asked his name, misspelled his last name as D–A–R–D–O–N, when in fact it was Darden. When we view these circumstances in their totality, we find "too slender a reed," *Reid*, 448 U.S. at 441, 100 S.Ct. at 2754, to support a reasonable articulable suspicion of criminal activity.

The State cites appellee's nervousness as a principal factor to buttress its argument that the officers reasonably suspected him of criminal wrongdoing. Court decisions have made it clear, however, that a person passing through an airport, train station or bus depot cannot be stopped solely because he appears nervous, harried, or anxious. "[C]ertain behavior characteristics [are] inherently *unsuspicious* and, thus, entitled to no weight in the calculation." *United States v. Saperstein*, 723 F.2d 1221, 1228 (6th Cir.1983) (emphasis added). The *Saperstein* Court cited both nervousness and travel to and from a source city as examples of such behavior. "Nervousness is entirely con-

sistent with innocent behavior, especially at an airport where a traveller may be anticipating a long-awaited rendezvous with friends or family." *U.S. v. Andrews,* 600 F.2d 563, 566 (6th Cir.1979).

In *Whitehead, supra,* nervousness was only one of several factors the Court considered in deciding that the police reasonably suspected the defendant was engaged in the transport of illegal drugs. Police said the defendant appeared startled, nervous, and began sweating profusely when approached by police. There also were other circumstances to consider in deciding whether police reasonably suspected the defendant of criminal activities, including the fact that Whitehead travelled from Miami, a major source city; he had stayed at a Miami hotel known as a meeting place for drug traffickers; he had arrived at the train station just minutes before his train was to depart and then repeatedly looked around the entrance before going inside the station; and when asked his name, he had responded "W. Tucker" rather than supplying a full name. *Whitehead,* 849 F.2d at 858.

In *Grant, supra,* the Court rejected the prosecution's contention that agents reasonably suspected the defendant because he was nervous, had shaking hands, and misstated the destination of his flight as Kennedy Airport rather than LaGuardia Airport. *Grant,* 920 F.2d at 386. *United States v. Haye,* 825 F.2d at 34, involved a man walking through an airport who appeared nervous, while his travelling companion followed some 20 to 25 feet behind him. Because they exhibited some of the characteristics of the drug courier profile, the officers approached the two as they left the terminal building; both men bolted. *Id.* at 33. The Fourth Circuit Court of Appeals held that police did not have reasonable suspicion sufficient to make an investigatory stop at the time of the initial encounter. The Court concluded, however, that "all of the circumstances, including the flight, furnished reasonable suspicion for a brief, involuntary, investigative stop." *Id.* at 34.

Innocent passengers fly on airplanes from such cities as Miami that are known sources of drug supplies. Some of them may take circuitous routes through airline terminals and appear nervous or furtive, but they do not break into precipitous flight upon being informed by a man in civilian clothing that he is a policeman. Against the background of drug courier characteristics they had shown, their flight from the presence of two men upon their announcement that they were policemen gave the police reasonable, articulable suspicion, based upon objective facts, quite sufficient to warrant a *Terry* stop.

*Id.*

In the case *sub judice*, there was neither evidence that Darden fit the drug courier profile nor was the issue of the existence, *vel non*, of reasonable articulable suspicion based on such a profile. The nervousness exhibited by Darden and the fact that he was en route from a source city and that he misspelled his name did not provide sufficient grounds for the police officers' investigatory stop. We hold, therefore, that the police did not have a reasonable articulable suspicion that the appellant was engaged in any criminal wrongdoing.

██ Assuming, *arguendo*, that the officers had reasonable suspicion sufficient for an investigatory stop, the officers' constitutional intrusion in the instant case would have exceeded that permitted by a *Terry* stop, and thus the officers were required to have probable cause to justify their prolonged seizure of the bag.

Once they seized the bag, the officers temporarily retained the bag to await the arrival of the drug-detecting canine. When the dog indicated that narcotics were in the bag, the officers removed the bag to the police station to obtain a warrant to search the bag and, once there, performed a second canine inspection with the same results. The officers then obtained the warrant. After obtaining the warrant, they searched the bag and found the illicit drugs.

In contrast to what occurred in *United States v. White*, *supra*, where the detention was for one minute, the drug-sniffing dog did not arrive for twenty minutes in this case. In circumstances where the information possessed was more than present here and the time of detention less, the *White* Court found the requisite reasonable articulable suspicion lacking. Probable cause was also lacking to seize the bag, as we explain *infra*.

In another factually similar case, the Supreme Court considered the detention of a defendant's luggage in *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). The defendant, in *Place*, boarded a New York-bound plane in Miami where agents had asked him if they could search his luggage. Even though the defendant consented, the police did not conduct a search because his flight was about to depart. The Miami officers alerted agents in New York who stopped him when he deplaned. When Place declined to let them search his luggage, the agents informed him that they were taking the luggage and would try to get a search warrant, which they did ultimately. About ninety minutes elapsed between the seizure of Place's luggage and the arrival of a drug-sniffing dog. The dog reacted positively to one of the defendant's bags. Because it was a late Friday afternoon, the agents kept the defendant's luggage until Monday when they secured a search warrant and discovered 1,125 grams of cocaine.

The Supreme Court determined that the agents made a "seizure" under the Fourth Amendment "when, following his refusal to consent to a search, the agent told Place that he was going to take the luggage to a federal judge to secure issuance of a warrant." *Id.* at 707, 103 S.Ct. at 2645. The Court, relying largely upon the length of time the agents detained the defendant's luggage, concluded that the agents had exceeded "the permissible limits of a *Terry*-type investigative stop." *Id.* at 709, 103 S.Ct. at 2645. The Supreme Court wrote:

> The precise type of detention we confront here is seizure of personal luggage from the immediate possession of the

suspect for the purpose of arranging exposure to a narcotics detection dog. Particularly in the case of detention of luggage within the traveler's immediate possession, the police conduct intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary. The person whose luggage is detained is technically still free to continue his travels or carry out other personal activities pending release of the luggage. Moreover, he is not subjected to the coercive atmosphere of a custodial confinement or to the public indignity of being personally detained. *Nevertheless, such a seizure can effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return.*

462 U.S. at 708, 103 S.Ct. at 2645 (emphasis added). The Court continued:

The length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of *probable cause*. Although we have recognized the reasonableness of seizures longer than the momentary ones involved in *Terry* ..., the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion.... Thus, although we decline to adopt any outside time limitation for a permissible *Terry* stop, we have never approved a seizure of the person for the prolonged 90–minute period involved here and cannot do so on the facts presented by this case.

Although the 90–minute detention of respondent's luggage is sufficient to render the seizure unreasonable, the violation was exacerbated by the failure of the agents to accurately inform respondent of the place to which they were transporting his luggage, of the length of time he might be dispossessed, and of what arrangements would be made for return of the luggage if the investigation dispelled the suspicion. In short, we hold that the deten-

tion of respondent's luggage in this case went beyond the narrow authority possessed by police *to detain briefly* luggage reasonably suspected to contain narcotics.

*Id.* at 709–10, 103 S.Ct. at 2645–46 (emphasis added) (citations omitted) (footnote omitted).

Under the above rationale and the facts of this case, the seizure of Darden's bag went beyond the pale of a *Terry* stop and into the realm of a full-blown seizure.

[T]he constraint on liberty imposed by a *Terry* stop is relatively minimal. It is limited in space in the sense that it does not involve removing the suspect from the place where he is initially stopped to some more remote location. It is limited in time in that its duration must be brief.

*Derricott v. State,* 84 Md.App. 192, 210, 578 A.2d 791 (1990).

Notwithstanding that the cited decisions emphasize that the detention must be brief, we do not decide (as did the Supreme Court regarding the ninety minute delay in *Place*) that a thirty minute delay is *per se* unreasonable. Our decision turns rather on whether there were indicia that appellee's bag was reasonably suspected of containing drugs, thereby rendering a brief detention reasonable.

The Fourth Amendment requires a valid warrant or a warrant exception to justify such a seizure. The officers in this case did not possess a warrant for the seizure of the bag. We have consistently held that "[w]arrantless arrests, searches and seizures are presumptively invalid and the burden is cast upon the State to rebut that presumption and establish their validity." *Anderson v. State,* 78 Md.App. 471, 484, 553 A.2d 1296 (1989), citing *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

The State argues that, under our decision in *Derricott, supra,* the officers were authorized to detain the bag temporarily to await the arrival of a narcotics detection dog. The recent reversal of our decision, in *Derricott,* by the

Court of Appeals severely undercuts the State's argument. As we have observed, *supra,* p. 383, the case *sub judice* was not decided on the basis of the drug courier profile although much of the analysis parallels the approach taken in such cases and many of the cases cited considered the use of profiles. Our decision, in *Derricott,* relied, in part, on the use of the drug courier profile. The Court of Appeals, in rejecting the use of such profiles absent data supporting their validity, said

In this case, the state has not disclosed any underlying statistics or data to explain why the combination of circumstances at issue here produces reasonable suspicion,

No attempt was made to explain how this profile was formulated, or even whether empirical evidence which might lead to its development exists,

. . . .

Without more the attributes the state claims were suspicious about Derricott's appearance simply are not enough to establish the requisite level of reasonable suspicion that Derricott was engaged in criminal activity.

*Derricott v. State,* 327 Md. 582, 591, 593, 611 A.2d 592 (1992.) Appellant's reliance on our decision in *Derricott* is flawed because reasonable suspicion was based on the discovery of the glassine bag. The decision of the Court of Appeals however provides even greater support for appellee's position.

In *Derricott,* the appellant was pulled over for a routine traffic violation. Believing the driver to fit the current "drug courier profile," before giving Derricott the traffic citation, the officer called for additional "back-up" and a narcotics detection dog. Upon returning to Derricott's car, the officer asked him to step out of the vehicle, at which time the officer leaned into the vehicle and saw a glassine bag in a console between the two front seats containing what he believed to be cocaine. The officer seized the bag, and the substance was later found to be cocaine.

Notwithstanding that the Court of Appeals has viewed drug courier profiles with disfavor where no statistical basis is set forth, the decision turned on the discovery of the glassine bag containing suspected narcotics, which fact renders the instant case distinguishable.

More to the point, however, the Court of Appeals, echoing the sentiments of the Supreme Court, in *Reid, supra* decried targeting descriptions and actions which fit a large category of innocent travelers and determined that one could not conclude that Darone Antonio Derricott was trafficking in drugs and was armed and dangerous simply because he was (1) a young, black male, (2) carrying a beeper, (3) wearing expensive jewelry and (4) driving an expensive sports car. *Derricott,* at 590, 611 A.2d 592.

The Court of Appeals observed, as had the *Reid* Court, that

> Those of his attributes which match the drug courier profile are sufficiently common that allowing a search and seizure, however brief, on this basis alone would subject too many innocent travelers to the invasion of privacy that such police action necessarily entails.

*Derricott v. State, supra,* at 592, 611 A.2d 592.

Despite the fact that in the case *sub judice* the lower court did not determine the reasonableness of the detention based on the drug courier profile, it is patently clear that Darden was a young, black male, proceeding from what Officers Mallory and Call considered a source city. While observations that a suspect is nervous and sweating are subjective and failure to produce one's train ticket and misspelling one's last name are subject to evaluation in the overall reasonable suspicion equation, the cataloguing of these factors serves the same purpose as compiling the more objective information which comprise the composite from which to predict that a citizen (in this case a traveller) is engaged in the illegal transportation of illicit drugs.

Bearing in mind the overriding privacy concerns and the need to avoid subjecting large numbers of innocent travel-

lers to the inconvenience and humiliation of drug interdictions, the common thread running throughout decisions involving detention of travellers or their luggage in public places is that, before a brief wait for the arrival of a drug-sniffing dog [can be] a reasonable incident of a narcotics related detention, the information relied upon ordinarily falls into one of two broad categories. The primary kinds of circumstances which will provide the basis for reasonable articulable suspicion are discovery of direct evidence of the existence of the contraband under circumstances constitutionally permitted (*i.e.*, plain view) prior to a search or seizure or activities particularly associated with practices incidental to drug operations and operatives but not considered to be normal conduct of the average citizen. In the latter category, one would not expect an innocent traveller to break into precipitous flight when approached by someone who identifies himself as a police officer. *See United States v. Haye, supra.*

The Court of Appeals contrasted the facts, in *Derricott*, with those extant in *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (a case in which the Supreme Court found reasonable suspicion based on a match to a drug courier profile) where, in addition to travelling to or from a source city and appearing nervous (factors upon which the State relies in this case), the suspect had paid $2,100 for two airplane tickets from a roll of $20 bills; he travelled under a false name; the name he travelled under did not match his telephone listing; he stayed in Miami for only 48 hours although his round trip flight took 20 hours; and he checked no luggage, *Derricott*, 327 Md. at 593, 611 A.2d 592. Targeting the type of conduct described in *Sokolow* would not likely "subject too many innocent travellers to the invasion of privacy that such police action entails." *Derricott*, at 592, 611 A.2d 592. Subjecting travellers to drug interdiction for the type of conduct exhibited by Darden would result in too many innocent citizens being caught in the net intended to ensnare drug dealers.

■ In the present case, the officers had nothing other than Darden's failure to produce his train ticket, misspelling of his last name, his nervousness and sweating, and the fact that he was aboard a train from a source city upon which to base their seizure (*viz,* narcotics-related detention) of the bag, prior to the arrival and indication of the drug-sniffing dog. Since none of these factors point to a narcotics detention and since those criteria, taken separately or as a whole, do not amount to probable cause sufficient to warrant the seizure, we hold that seizure of Darden's bag lacked probable cause and was illegal.[3]

## GOOD FAITH EXCEPTION

The State next contends, assuming *arguendo* that the seizure of the bag was illegal, the evidence should not be suppressed because the bag was searched pursuant to a search warrant upon which the officers had a right to rely, the appellee was arrested pursuant to an arrest warrant, and a subsequent statement was made to the police by Darden after having been advised of his *Miranda* rights.

---

**3.** Officer Mallory apparently attempted to conform his investigative procedures to accepted practices in the interdiction of drug couriers. That the officers did not arrest Darden at the Metro Station is indicative that they knew that they did not possess the requisite probable cause to effectuate his arrest. It is evident that the officers did not know to a "fair probability" that there was contraband or evidence of a crime inside Darden's bag. Had they possessed the requisite probable cause, they would not have needed to call the drug-sniffing dog to confirm or dispel their suspicions and could have searched the bag upon seizure. Additionally, had the officers had probable cause, they could properly have arrested Darden at the Metro Station and searched the bag incident to a lawful arrest. We have, in previous decisions, upheld searches made incident to arrest, even when the search occurred prior to the actual arrest under the rationale that the officers had probable cause to arrest at the time of the search, and therefore the acts are deemed to have "occurred instantly, one after the other." *Anderson v. State,* 78 Md.App. at 483, 553 A.2d 1296. *See also Brent v. State,* 311 Md. 626, 537 A.2d 227 (1988), and *Whitmire v. State,* 61 Md.App. 548, 487 A.2d 686 (1985). The contemporaneity as to search and arrest is not extant here although the appellant had the option of remaining with his bag. In fact, the officers told Darden that he was free to go while they waited with his bag for the arrival of the drug-sniffing dog.

Appellant acknowledges that the court's rulings "were premised on the belief that the initial seizure of the bag tainted all of the subsequent events." Appellant concludes that "the issuance of the warrants were intervening events that justified the officers' good faith reliance thereby making suppression inappropriate."

Appellant acknowledges that the exclusionary rule remains the principal remedy in the event of illegal police conduct (citing *McMillian v. State*, 85 Md.App. 367, 377, 584 A.2d 88 (1991), *vacated and remanded on other grounds*, 325 Md. 272, 600 A.2d 430 (1992)), but argues that "whether the exclusionary sanction is appropriately imposed in a particular case ... is an 'issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule are violated by police conduct,'" (citing *United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 3412, 82 L.Ed.2d 677 (1984)). Appellant then posits that we are constrained to decide whether "granting establishment of the primary illegality, the evidence ... has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint," rather than to decide whether the evidence would not be discovered "but for" the law enforcement officer's illegal conduct, citing *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). Appellant concludes that the evidence in this case is admissible despite prior illegal conduct by the seizing officer if "it [the evidence] has an 'attentuated link' to the underlying illegality. Citing the concurring opinion (Powell, J.) in *Brown v. Illinois*, 422 U.S. 590, 610, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975), appellant asserts "the notion of the dissipation of the taint attempts to make the point at which the detrimental consequences of illegal police action becomes so attenuated that the deterrent effect of the exclusionary rule no longer justified the cause."

Appellee replies that the Fourth Amendment exclusionary rule applies equally to statements and tangible evidence obtained following an illegal arrest or an otherwise illegal

search and seizure, citing *Ryon v. State*, 29 Md.App. 62, 71, 349 A.2d 393 (1975). Appellee further contends that not "a scintilla of proof" exists that the taint was attenuated or that there is lacking a causal relationship between the illegal conduct that was exhibited by Officers Mallory and Call regarding the seizure and subsequent reliance by the officers on the search warrant. Darden notes that Officers Mallory and Call "were the officers relying on the search warrant," and that they were thus "fully informed of the events conveyed to the government in obtaining the warrant and, therefore, cannot argue an intervening act or event dissipated the illegal seizure, since they knew first-hand that none existed." For the sake of clarity, we shall discuss these theories separately.

### The Search Warrant

■ Because the seizure of the bag preceded the indication of the presence of drugs by the narcotics detection dog, the seizure was illegal by reason of the lack of the requisite probable cause. The facts contained in the affidavit in support of the search and seizure warrant are simply a narration of the events surrounding the illegal seizure of the bag. In *United States v. Leon, supra,* the Supreme Court set forth an objective test for applying the good faith exception to the warrant requirement. The Court wrote:

> Accordingly, our good faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.

*Id.* at 922 n. 23. *See also Connelly v. State*, 322 Md. 719, 730, 589 A.2d 958 (1991); *State v. Jacobs*, 87 Md.App. 640, 591 A.2d 252 (1991). In *Jacobs*, we concluded that

> [in *Leon* ], the fact of issuance of a facially valid warrant, without more, is enough to justify the constitutional intrusion in the absence of dishonesty or recklessness or lack of a reasonable belief, on the part of the officer, in

the existence of probable cause. *Leon,* 468 U.S. at 926, 104 S.Ct. at 3422.

We further observed, in *Jacobs* however, that

a *Leon* analysis requires a threshold determination that the police officer acted [in seizing or searching] in reliance on the facially valid warrant. It is that he acted under color of authority and pursuant to a lawful command, *i.e.,* a judicially authorized warrant that imputes to his actions legal efficacy.

Thus, although good faith reliance on a facially valid warrant is accorded great weight, our inquiry does not end there.

*Id.* 87 Md.App. at 653–54, 591 A.2d 252. Thus, for the good faith exception to apply, there must be a facially valid warrant and the officers, in fact, must have relied upon that warrant in executing the search.

In the case *sub judice,* we note, however, that the trial court made no factual determination of whether the officers reasonably relied in good faith upon a facially valid warrant in executing their seizure and subsequent search of Darden's bag. Because the court made no factual determination, we are confined to the language of the affidavit in reviewing the applicability of the good faith exception. *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The Court of Appeals noted in *Connelly v. State,* 322 Md. at 735, 589 A.2d 958, that, "[a]s application of the good faith exception to the allegations of the affidavit presents an objectively ascertainable question, it is for the appellate court to decide whether the affidavit was sufficient to support the requisite belief that the warrant was valid." (Citations omitted). The pertinent portions of the affidavit that accompanied the application for the warrant to search the bag in this case read:

Your affiant then asked Ricky Darden for consent to search the sports bag that he was carrying. That Ricky Darden stated that your affiant could search the bag. Your affiant then started to open the main pouch of the bag and began to search the said pouch. That Ricky

Darden then grabbed the bag, stated that your affiant could not search the bag any more and started to walk away. At that point all searching of the said bag ceased and your affiant informed Ricky Darden that he intended to temporarily detain the bag until a narcotic detection dog could respond to the train station. Your affiant further advised Ricky Darden that he was free to leave or stay as he wished.

. . . .

Your affiant requested a narcotic detection dog to respond to the scene. At approximately 1420 hours, Officer Chandler # 176 and dog "Wolf" responded. The "Wolf" performed an inspection of the said bag having a positive indication that controlled dangerous substances were concealed inside the said bag.

From the facts set forth above, the officers did not have probable cause as to the presence of narcotics until such time as the drug-sniffing dog arrived and made an affirmative indication. The seizure of the bag, however, was clearly effected before the officers had the requisite probable cause to seize the bag. As we noted in *Jacobs, supra,* in order for the good faith exception to the warrant rule to apply, it must first be demonstrated that the officers relied upon the judicially approved warrant in effectuating the seizure. Here, it is evident that there could be no reliance on a warrant that had neither been prepared or submitted for approval at the point in time that the bag was seized.

Considering the underlying rationale of the exclusionary rule, the Supreme Court said in *Leon,* 468 U.S. at 919, 104 S.Ct. at 3418, quoting *Michigan v. Tucker,* 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974), and *United States v. Peltier,* 422 U.S. 531, 539, 95 S.Ct. 2313, 2318, 45 L.Ed.2d 374 (1975):

"The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to

instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force."

In *Peltier*, 422 U.S. at 542, 95 S.Ct. at 2320, the Court further explicated:

If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.

Turning to the Supreme Court's holding in *Leon,* the Court specifically carved out four exceptions to the application to the good faith reliance principle:

Deference to the magistrate, however, is not boundless. It is clear, first, that the deference accorded to a magistrate's finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based. Second, the courts must also insist that the magistrate purport to "perform his 'neutral and detached' function and not serve merely as a rubber stamp for the police." A magistrate failing to "manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application" and who acts instead as "an adjunct law enforcement officer" cannot provide valid authorization for an otherwise unconstitutional search.

Third, reviewing courts will not defer to a warrant based on an affidavit that does not "provide the magistrate with a substantial basis for determining the existence of probable cause." "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." Even if the warrant application was supported by more than a "bare bones" affidavit, a reviewing court may properly

conclude that, notwithstanding the deference that magistrates deserve, the warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances, or because the form of the warrant was improper in some respect.

*Leon,* 468 U.S. at 914–15, 104 S.Ct. at 3416–17 (footnotes omitted) (citations omitted).

In the case *sub judice,* Officers Mallory and Call clearly had knowledge or were properly charged with the knowledge that the search was unconstitutional because it was the action of Mallory in seizing the bag that constituted the illegality.[4]

The issuing magistrate's probable cause determination reflected an "improper analysis of the totality of the circumstances" because the affidavit states that Ricky Darden grabbed the bag, told Mallory he could not search the bag anymore, and started to walk away. After Darden was advised that the bag would be detained until a narcotics detection dog arrived, he departed. Significantly, the affidavit reveals that the delay was twenty to thirty minutes.

At the very least, the excerpt from the affidavit demonstrates that the issuing magistrate engaged in an improper analysis of the totality of the circumstances since he signed the warrant that was supported by facts constituting illegal activity by the police officers.

---

**4.** Appellant contends that "[t]he Court of Appeals' decision in *Connelly* recognizes that police can act in good faith reliance on the issuance of a warrant even when their actions serve as the basis for the warrant," citing 322 Md. at 735, 589 A.2d 958. The State misses the point, however, because the *Connelly* Court ultimately held that "the officers ... could have reasonably believed that the averments of their affidavit related a present and continuing violation of the law...." *Id.* In other words, the Court held that the belief of the officers was reasonable. While there can be no good faith reliance in this case in any event because there was no reliance on the warrant, there was no factual finding in the hearing on the motion to suppress that any belief by Officers Mallory and Call was reasonable that their detention was legal.

Considering the appellee's contention that "the fourth exception is applicable because of Officer Mallory's misleading account of the fact regarding Mr. Darden's withdrawal of consent," the motion to suppress filed by the appellee, as would be expected, asserted that the seizure of the "tangible evidence" was illegal because it was conducted outside the judicial process without prior approval by a judge or magistrate and did not come within one of the recognized exceptions to the warrant requirement. The Court of Appeals in *Connelly v. State*, 322 Md. at 726, 589 A.2d 958, explained the procedure in challenging a warrant asserted to be based on defective probable cause:

As stated by the Supreme Court in *Franks v. Delaware, supra*, 438 U.S. at 164, 98 S.Ct. at 2680, the bulwark of the Fourth Amendment protection is the Warrant Clause, which requires, absent certain exceptions, that the police obtain a search warrant, based upon a showing of probable cause, before embarking upon a search. In that case, the question before the Court was whether, after a search warrant had been issued, the defendant had a right "to challenge the truthfulness of factual statements made in an affidavit supporting the warrant." *Id.* at 155, 98 S.Ct. at 2676. In concluding that there was such a right, the Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id.* at 155–56, 98 S.Ct. at 2676. The Court indicated that if the defendant proves at that hearing, by a preponderance of the evidence, "with the affidavit's false material set to one side, [that] the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided." *Id.*

The *Connelly* Court thereafter discussed the scope of review of the asserted defective warrant:

As Connelly did not request a hearing pursuant to the procedure authorized by *Franks v. Delaware, supra,* and thereby create an evidentiary record with respect to the claimed misrepresentation of the affiants, we are limited to the affidavit itself in determining the applicability of the *Leon* good faith exception.

*Id.* 322 Md. at 735, 589 A.2d 958.

In the present case, there was neither a request by the appellee or a finding by the judge at the suppression hearing that Darden made a substantial preliminary showing that a false statement knowingly and intentionally or with reckless disregard for the truth had been included in the affidavit supporting the warrant. What the appellee specifically contended in his motion to suppress (correctly so, we believe) was that the seizure had occurred without the prior approval of the judge who issued the warrant. Accordingly, the trial judge at the suppression hearing made his determination based on the failure to demonstrate articulable reasonable suspicion under *United States v. Place, supra,* and was never presented with the allegation that Officer Mallory, as evidenced by his testimony, knew that the manner in which the bag was seized from Darden as he attempted to walk away was inaccurate as portrayed in the affidavit.

Consequently, assuming, *arguendo,* that the good faith exception was applicable to the case at bar, under *Connelly v. State,* 322 Md. at 735, 589 A.2d 958, we are limited to the affidavit itself in determining whether the *Leon* good faith exception is available to the appellant in this case. The result is that, contrary to appellee's assertion, the reviewing court would be unable to determine the alleged inaccuracy of the facts set out in the warrant since the testimony offered was not pursuant to *Franks,* but rather to demonstrate that the seizure was illegal because it preceded the judicially approved warrant.[5] Notwithstanding that appel-

---

**5.** *Cf. State v. Jacobs,* 87 Md.App. at 651, 591 A.2d 252, wherein we observed that the evidence extrinsic to the warrant affidavit required

lee cannot challenge the good faith exception on the basis of the alleged false or misleading version of Darden's withdrawal of his consent and ultimate attempt to leave with the bag, appellant nevertheless can find no solace. As we have stated at the outset, there can be no reliance on a warrant that was nonexistent at the time that the bag was seized.

## ATTENUATION OF ILLEGALITY

Appellant's alternative argument has commingled the concepts of the good faith exception under *Leon* with the notion of attenuation of taint as delineated in *Wong Sun v. United States, supra,* and explicated in *Alderman v. U.S.,* 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176 (1969). Appellant has attempted to set up the good faith exception as a form of attenuation of the illegal seizure and the consequent taint on any evidence obtained either directly or derivatively from that seizure. We have extracted and discussed separately the good faith exception, *supra,* concluding that, under the facts of the instant case, it is simply irrelevant to the question of whether the seizure of the bag in this case comports with the requirements of the Fourth Amendment.

### *Arrest Warrant*

■ The appellant nevertheless argues that the arrest warrant, admittedly issued after the search warrant had been approved and executed, operated to attenuate any taint from the illegal seizure of the bag. In a somewhat circular and unclear argument, appellant asserts that Darden's arrest was not the result of the detention of the sports bag, but rather the result of the approval by judicial officials of the actions of the police, ostensibly in issuing

---

at a *Franks* hearing was adduced when the State attempted, in response to the offer of proof by Jacobs, to establish that criminal activity was ongoing, and thus probable cause was not stale. Jacobs had attempted to establish that the probable cause was stale and hence inadequate because the officer knew that Jacobs might move from his residence, the target of the search warrant.

the arrest warrant and the search warrant. Without benefit of authority, the appellant ultimately concludes that the guns and other evidence found should not have been suppressed because Darden was searched as an incident of the judicially approved arrest. The bedrock of the State's thesis is that somehow the ensuing arrest in no way was the direct or derivative result of the illegal seizure of the bag in the first instance. Judge Moylan, speaking for this Court in the recent decision in *State v. Klingenstein*, 92 Md.App. 325, 360–61, 608 A.2d 792 (1992), opined:

> The "fruit of the poisonous tree" doctrine holds that when the Constitution has been violated in obtaining evidence, such tainted evidence shall not only not be used directly but shall not be used at all. It prohibits not only the direct use of the tainted evidence but also its derivative use. The "fruit of the poisonous tree" doctrine would go further and also bar such derivative uses of such evidence as the exploitation of the knowledge gained so as to develop further leads; or, of pertinence here, the use of such tainted evidence to establish probable cause for the issuance of a subsequent warrant.
>
> ....
>
> ... They are sometimes referred to, in a commonplace flight of rhetoric, as "three ways of unpoisoning the fruit." More aptly, they are three ways of determining that the fruit was not poisoned in the first instance. One of these, not here pertinent, is the "attenuation of taint." Another, also not here pertinent, is "inevitable discovery."
>
> The third of the exemptions, the one that concerns us in this case, is that of "independent source." That a constitutional violation preceded the discovery of the evidence in question does not establish that the constitutional violation caused the discovery. The time sequence does, indeed, establish a presumption to that effect. The State is given the opportunity, however, to demonstrate that the evidence proceeded from an independent source. [Citations omitted.]

It would be folly to suggest that Officers Mallory and Call would have been led to 14808 London Lane, from where Darden was pursued and ultimately apprehended, in the absence of the initial interdiction at the Metro Station. The record before us discloses that the State has not demonstrated that the evidence proceeded from an independent source, nor does it appear that either of the other two ways of "unpoisoning the fruit" are pertinent here. On the contrary, the record reveals a clear and unbroken chain from the seizure of the bag to the obtention of the search warrant and arrest warrant to the ultimate seizure of the person of Darden and the contraband found on him.

### Appellee's Statements

■ Citing *New York v. Harris*, 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), appellant claims that the holding in *Harris* that the warrant requirement for an arrest in the home is imposed to protect the home, distinguishing it from a statement taken outside of the house after *Miranda* warnings have been given, supports its position. Appellant analogizes the exit from the house "necessarily breaking the causal chain between the illegality and any subsequent statement by the suspect" and appellant's belief that a break in causation results from the fact that Darden had been given *Miranda* warnings coupled with his subsequent arrest pursuant to a judicially authorized warrant. Appellant also attempts to distinguish *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), relied upon by the judge who conducted the suppression hearing, on the basis that *Dunaway* was decided prior to the good faith exception; that *Dunaway* involved a warrantless detention of the accused; that the accused in *Dunaway* was himself immediately seized and gave a statement during his detention; and that, in the instant case, "the police took measured steps and sought and obtained approval by judicial authorities on two separate occasions."

Initially, the Supreme Court in *Harris* held that the exclusionary rule does not bar the State's use of a state-

ment made by the defendant outside of his home, even though the statement is taken after an arrest is made in the home in violation of *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).[6] Pivotal to the Court's reasoning was the existence, at the outset, of probable cause and the conclusion that the statement was not the result of exploitation of the illegal arrest under *Payton.* It should be noted that the Court excluded a second statement, finding that its connection with the arrest was not sufficiently attenuated. We fail to see the precise applicability of *New York v. Harris* to the instant case.

Moreover, the Supreme Court, in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), considered a statement that was derivative of an illegal arrest:

> Brown's first statement was separated from his illegal arrest by less than two hours, and there was no intervening event of significance whatsoever. In its essentials, his situation is remarkably like that of James Wah Toy in *Wong Sun.* We could hold Brown's first statement admissible only if we overrule *Wong Sun.* We decline to do so. And the second statement was clearly the result and the fruit of the first.

*Id.* at 605, 95 S.Ct. at 2262 (footnotes omitted). *See also Ryon v. State, supra.*

While the statement in *Brown* resulted from an illegal arrest as opposed to an illegal seizure, it nonetheless is the end result in a causal chain of events that began with the primary illegality of the officers, *i.e.,* the seizure of the appellee's bag.

Finally, appellant's attempt to distinguish *Dunaway v. New York, supra,* on four different bases is without merit. It is immaterial that the good faith exception to the exclu-

---

**6.** The Supreme Court held, in *Payton,* that a warrantless arrest effected within the home is to be viewed with greater circumspection than such arrests in public places because "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." 445 U.S. at 585, 100 S.Ct. at 1379.

sionary rule was decided after *Dunaway* since, as we have held, the good faith exception is not applicable to the facts of this case in any event. The remaining bases upon which appellant attempts to distinguish *Dunaway* all relate to the actions by the police officers asserted to be intervening steps which appellant argues attenuate the taint of the initial illegal seizure. The short answer to appellant's arguments is that none of these actions on the part of the police constitutes an independent source and in no way can it be suggested that, on this record, the State would have gathered the evidence necessary to proceed against Darden for possession of the contraband contained in the bag when stopped at the Metro Station or the contraband subsequently found on him at the time of his arrest had the illegal seizure of the bag not provided the initial link in the chain of events leading to seizure of evidence of Darden's illegal drug activity. In other words, all of the evidence in this case has indeed "been come at by exploitation of [the primary] illegality." *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417.

For the stated reasons, we issued our per curiam order on August 12, 1992, affirming the order of the trial court.