**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                No. 96-4357

RICKY DARDEN,
Defendant-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CR-93-447)

Argued: October 28, 1997

Decided: June 16, 1998

Before WILKINSON, Chief Judge, MURNAGHAN, Circuit Judge,
and PHILLIPS, Senior Circuit Judge.

_____

Affirmed by unpublished opinion. Senior Judge Phillips wrote the
opinion, in which Chief Judge Wilkinson and Judge Murnaghan
joined.

_____

**COUNSEL**

**ARGUED:** Robert Lawrence Lombardo, Jr., William Collins Bren-
nan, Jr., KNIGHT, MANZI, BRENNAN, SHAY & HAM, Upper
Marlboro, Maryland, for Appellant. Brent Jefferson Gurney, Assistant
United States Attorney, Greenbelt, Maryland, for Appellee. **ON
BRIEF:** Lynne A. Battaglia, United States Attorney, Greenbelt,
Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PHILLIPS, Senior Circuit Judge:

Ricky Darden appeals from a judgment of conviction of possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1). He challenges only the district court's denial of his motion to suppress evidence that he contends was obtained by an unconstitutional investigatory detention. We affirm.

I

In the light most favorable to the Government, the evidence at the suppression hearing revealed the following facts. On August 20, 1991, Metro Transit Police Officers Tommy J. Call and Timothy E. Mallory were engaged in a drug interdiction operation at the Amtrack train station in New Carrolton, Maryland. The New Carrolton station was known by them to be a "transit point" for narcotics because it was the last southbound stop before Union Station, the first station in the District of Columbia and one known to drug couriers to be heavily patrolled by narcotics officers. The officers' interdiction efforts were concentrated on train passengers coming from New York City, a known "source city" for narcotics.

On the day in question, Call, who was in plain clothes, positioned himself at one end of the train platform, near the elevator. Mallory, also in plain clothes, stationed himself at the other end of the plat-form, near the escalators. At 1:50 p.m., a train from New York City arrived in the station and approximately twenty people disembarked. Call approached and began speaking with a passenger he suspected might be a drug courier. While engaged in conversation, Call noticed Darden heading in his direction. When Darden was five or six feet from Call, he made eye contact with Call, stopped,"made almost a 180 degree turn," and began walking "briskly" in the opposite direc-tion, towards the escalators. As Darden walked away, he looked back

2

at Call. Because he was still engaged in conversation with the first passenger, Call tried to attract Mallory's attention and alert him to Darden. Call lost sight of Darden as he turned to board the escalator. When Call completed his conversation with the first passenger, he proceeded down the platform after Darden.

Although Mallory did not see Call's signal, he independently focussed on Darden. When Darden got within five feet of Mallory, Darden "almost stopped in his tracks," made eye contact with Mallory, "appeared to look [him] up and down," then turned, went through a door and boarded the escalator. As Mallory followed Darden down the escalator, Darden turned and looked at Mallory three times over his left shoulder and once over his right shoulder. When Darden got off the escalator, he approached the door leading to the Metro station, looked back at Mallory one more time and then entered the Metro station. At this point, Mallory approached Darden, identified himself as a police officer, and asked Darden if he could speak with him. Darden agreed. Mallory thought it unusual that Darden was sweating since both the train and the station were air conditioned and, though Mallory had been on the platform for ten minutes, he was not sweating. According to Mallory's testimony, Darden's nervousness was consistent with that of other people he had arrested for drug possession.

Mallory explained to Darden that he was working drug interdiction and began to ask Darden a series of questions. In the meantime, Call was making his way to, then down, the escalator following Darden. When he caught up with Darden, Mallory was already talking to him. Without speaking to either Mallory or Darden, Call took up position about 10 to 15 feet away to observe the proceedings.

Mallory began his questioning of Darden by asking him if he had a train ticket. When Darden said no, Mallory, suspecting that he might be trying to avoid disclosing where his trip originated, pointed out to Darden that he had to have a ticket to ride the train. At this, Darden pulled out his wallet and started, per Mallory,"fumbling through it." While Darden was looking through his wallet, Mallory saw what looked like a ticket and pointed it out to Darden. Although, according to Mallory, Darden's hands were "shaking so bad he almost couldn't take the ticket . . . out," he managed to remove the ticket and give it

3

to Mallory. The ticket indicated it was purchased at Penn Station, New York City. Mallory returned the ticket to Darden and asked who purchased the ticket. Darden said that his mother purchased the ticket for him. Mallory then asked Darden his name. Darden responded with his correct name but, when asked, spelled his last name with an "o." When Mallory asked Darden for some identification, Darden gave him an unofficial identification card from his wallet. On the card, Darden's last name was spelled with an "e." Mallory gave the card back to Darden and asked him where he was going. Darden responded that he was going to London Lane in Bowie. Mallory then asked Darden if he had any large amounts of drugs or currency on him or in his bag. When Darden said no, Mallory asked Darden for consent to search his bag. After Darden agreed to the search, Mallory knelt down and unzipped the bag, which Darden had placed on the ground.

The only part of Mallory's exchange with Darden that Call was able to overhear was that which occurred when Mallory asked for and received consent to search the bag. Call testified, however, that during Mallory's questioning, Darden appeared nervous:

> [H]is hands were moving rather quickly. He was talking with his hands. He was turning back and forth with his head. He was talking very rapidly. His mouth seemed to be dry. You could h[ear] a lot of noise coming from it, like little pops. You could actually see little flecks of spit in the corners of his mouth.

After consenting to the search, Darden walked over to Call and asked whether he had to let Mallory search his bag. Call said: "[N]o, he explained it to you that it's purely consen[s]ual, and if you don't want us to search the bag we'll stop." Darden then told Call he wanted the search to end and Call indicated that Darden needed to instruct Mallory to stop. Darden walked over to Mallory (who at this point had found only clothes) and told him to stop. Darden then "grabbed the handles [of the bag] abruptly right out of [Mallory's] hands" and walked away "at a quick pace." Mallory testified that the manner in which Darden took the bag "led [him] to believe that [Darden] was trying to conceal contraband inside the bag and he didn't want [Mallory] to see it." Mallory further testified that until Darden grabbed the bag, he was not going to detain the bag.

4

After Darden retrieved his bag, Call and Mallory"exchanged a glance" and without verbally communicating, nodded in agreement that they would seize the bag. Catching up with Darden, Mallory took the bag from him, told him that he was temporarily detaining it so that a narcotics detection dog could do an external inspection, and informed him that he was free to stay or go as he pleased. Darden provided the officers with an address where they could return the bag and left. Approximately twenty minutes later, a trained dog sniffed the bag and alerted to the presence of drugs. After another dog also alerted to the bag, Mallory obtained a search warrant for the bag and found in it over 200 grams of crack cocaine. Darden was located and arrested by state officers the next day. At the time of his arrest, Darden was carrying two pistols and a triple beam scale. In an ensuing state court prosecution, Darden successfully moved for suppression of the evidence and dismissal of the prosecution by a state trial court whose ruling was affirmed by the Maryland Court of Special Appeals, see State v. Darden, 612 A.2d 339 (Md. Ct. Spec. App. 1992), and denied review by the Maryland Court of Appeals, see State v. Darden, 614 A.2d 974 (Md. 1992), and the United States Supreme Court, see Maryland v. Darden, 508 U.S. 957 (1993) (White and Thomas, JJ., dissenting from denial).

Darden was then charged in a federal indictment with conspiracy to distribute cocaine base in violation of 21 U.S.C.§ 846; possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1); using and carrying a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c); and possession of a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year in violation of 18 U.S.C. § 922(g). Following his arrest some two years later after remaining a fugitive during the interval, Darden moved pre-trial to suppress all tangible evidence obtained by law enforcement officers, arguing that the seizure of his bag was not justified by a reasonable, articulable suspicion and thus was unconstitutional under Terry v. Ohio, 392 U.S. 1 (1968). After an evidentiary hearing, the district court denied Darden's suppression motion.

Upon motion by the government, the district court dismissed all counts except that of possession with intent to distribute cocaine base. Darden waived his right to a jury trial and after a bench trial, the dis-

5

trict judge found Darden guilty. He was given a mandatory life sentence under 21 U.S.C. § 841(b)(1)(A) because he had three prior convictions for drug felonies.

This appeal followed.

II

Darden does not challenge the constitutionality of any of the police conduct before the officers took the bag from his possession; he concedes that officer Mallory's initial questioning and interrupted search of the bag were done consensually. His constitutional challenge is to the later taking of his bag and its ensuing detention until subjected to the first external detection of drugs. The first, he says, was not based upon a reasonable, articulable suspicion of criminal conduct, hence was not justified as a brief investigatory detention. The second, he says, was, because of its unreasonable duration, a warrantless seizure of his property not based upon probable cause. Both, he claims, therefore violated his Fourth Amendment rights and he assigns an error to the district court's ruling to the contrary.

We disagree on both points.

A

We first consider whether the district court erred in ruling that the initial act of taking the bag from Darden's possession was justified as an investigatory detention.

Law enforcement officers may make brief investigatory detentions of persons when they have "a reasonable and articulable suspicion that the person . . . is engaged in criminal activity." Reid v. Georgia, 448 U.S. 438, 440 (1980) (per curiam); see also Terry, 392 U.S. 1. Because detention of a traveling person's luggage such as occurred here is effectively a seizure as well of the person, it must be comparably justified. See United States v. Place, 462 U.S. 696, 708-09 (1983).

In denying Darden's suppression motion, the district court therefore necessarily ruled that the law enforcement officers did have a

6

reasonable and articulable suspicion that Darden was engaged in criminal activity, specifically, the illegal possession of some form of contraband. We review de novo the court's ultimate determination of a justifying suspicion; we review only for clear error the court's underlying findings of historical fact. See Ornelas v. United States, 517 U.S. 690, 699 (1996). But, even in conducting de novo review of the ultimate determination, we are instructed to "take care . . . to give due weight to inferences drawn . . . by resident judges and local law enforcement officers," and that "a police officer may draw inferences based on his own experience." Id. at 699-70. And, in reviewing a reasonable suspicion determination, we must evaluate it in light of the "totality of the circumstances" as perceived and reasonably inferred by the police officers at the critical time. See United States v. Sokolow, 490 U.S. 1, 8 (1989) (citation omitted). While the level of suspicion reasonably raised by those circumstances must be more than an "inchoate or unparticularized suspicion or `hunch'", Terry, 392 U.S. at 27, it obviously need not be as high as that required to establish probable cause. See Sokolow, 490 U.S. at 7. Reviewing under these principles the district court's determination that the officers had a reasonable, articulable suspicion rather than a more unparticularized hunch, we find no error.

First off, there is no clear error in the district court's underlying findings of historical fact. Specifically taking into account the lapse of time between events and testimony and some internal inconsistencies in the officers' testimony, the court expressly found their testimony credible in its most salient aspects. Accepting that testimony, the court found the following facts, either expressly or by clear implication: (1) Darden got off a train from New York City, a city known by the officers from experience to be a major "source city" for drug trafficking; (2) he got off at New Carrolton, a station known by them from experience to be one currently favored by drug couriers as a "transit" point because the next station south, Union Station in the District of Columbia, was known by couriers to be one heavily patrolled by narcotics officers; (3) once off, Darden first started walking directly toward the elevator where Call, in plain clothes, was questioning another passenger; when he got close to Call he made eye contact with him, immediately turned abruptly around, and went quickly in the opposite direction toward the escalators, turning to look back at Call as he moved away; (4) as Darden then approached the

7

escalators where Mallory, also in plain clothes, was positioned, he made eye contact with Mallory, almost stopped and looked Mallory over before turning to go through a door onto the down escalator; (5) when Mallory, alerted by this conduct, got on the escalator to follow Darden, Darden looked back at him several times before reaching the Metro station level, then again before entering the station; (6) when Mallory then stopped Darden, revealed his purpose and engaged him in questioning, Darden was visibly nervous, sweating, shaking and stammering as he first misrepresented that he did not have a train ticket, then fumbled in removing it from his wallet after Mallory pointed it out; and (7) after withdrawing consent to further search of his bag following his inquiry to Call, Darden abruptly seized the bag from Mallory's possession and walked quickly away.

The court then concluded that considered in their totality these circumstances were sufficient to create a reasonable suspicion of wrongdoing that justified the initial detention of the bag for investigatory purposes. Darden challenges this ultimate conclusion as not adequately supported by the evidence. Principally, he contends that every aspect of his conduct on which the district court relied would "describe a very large category of presumably innocent travelers." Reid, 448 U.S. at 441. And, he points out that even the officers did not think they had the required level of suspicion until he took the bag from Mallory and moved away with it. That last act, he says, could not properly be considered to have created a reasonable suspicion that did not before exist. We disagree with these contentions.

It is undoubtedly true that each of the particular circumstances relied upon, if looked at in isolation, could be thought consistent with the conduct of many completely innocent travelers. Many innocent persons take trains from drug "source cities" and many get off at drug "transit" cities. Abrupt changes of direction could reflect nothing more than unfamiliarity with the surroundings or simple changes of mind. Making eye contact with strangers could be nothing more than simple inadvertence or a reflexive staring back at one who initiated the contact. Nervousness and its visible signs might afflict anyone being questioned by persons identified as police officers. Anyone might sweat on an August day in southern Maryland. Backward glances at strangers with whom one had had specific eye-contact encounters (by whomever initiated) might reflect legitimate concerns

8

for safety on anyone's part. And if, as Darden suggests, only his act of grabbing his bag from Mallory and walking quickly away could be taken into account in view of the officers' conceded belief that until then the suspicion level was not high enough, that act considered alone might well not suffice.

Our assessment of the circumstances as found by the district court is not so narrowly constrained. We consider them in their totality, not piecemeal and in isolation. And, in doing so, we must "give due weight to inferences drawn from those [circumstances] by resident judges and local law enforcement officers," recognizing that inferences may be drawn by police officers "based on[their] own experience." Ornelas, 517 U.S. at 699-70.

Here, we must therefore give due weight to the officers' inferences, as accepted by the district court, that Darden's conduct in total compass was that of a furtive wrongdoer rather than a merely confused and intimidated innocent. The facts found by the court clearly support those inferences. Darden's evasive reactions upon successively encountering the two plain clothes officers clearly support a mounting suspicion that he was a streetwise traveler up to no good who was knowledgeable of police practice and therefore was engaged in his own counter-surveillance efforts. Further support for this inference is found in Darden's independent identification of Call as a non-uniformed police officer that is revealed by his approaching Call to ask if he might withdraw consent to further search. Finally, the officers were entitled to treat Darden's grabbing of his bag from Mallory and hasty departure as a final straw in a culminating course of conduct. As the district court pointed out, this bespoke a particular concern about revelation of the bag's contents that reasonably could have been seen to provide the final confirmation.

We therefore find no error in the district court's ruling that the officers' act of taking the bag from Darden was justified as a reasonable investigatory detention that did not violate his Fourth Amendment rights.

B

Darden's alternative contention that the twenty-minute delay between the taking of his bag and the first external detection of drugs

9

converted the detention into a seizure of his property without probable cause is unavailing.

Aside from the fact that this objection is now raised for the first time, it fails on the merits. Whether the duration of an investigatory detention of property may itself convert a legal detention into an unconstitutional warrantless seizure depends upon the circumstances: (1) the time lapse involved; (2) whether the police acted diligently; (3) whether the detention was unduly prolonged; (4) whether the suspect was clearly advised of the planned handling of his property, including its return; and (5) the importance of the governmental interest asserted as justification for the delay. See United States v. Alpert, 816 F.2d at 958, 964 (4th Cir. 1987) (outlining factors to be considered in reliance on Place, 462 U.S. 696). Here, there is no dispute that the police acted diligently, nor that Darden was adequately advised of the procedures to be followed, nor that the Government's interest in confirming the officers' reasonable suspicion by an external inspection was an important one. The facts do not suggest any excessive time lapse nor any undue prolongation of the time reasonably required to make the inspection. We have held in generally comparable circumstances that a time lapse of thirty-eight minutes was not excessive nor unduly prolonged. See United States v. McFarley, 991 F.2d 1188, 1194 (4th Cir. 1993).

Accordingly, we find no error in the district court's failure sua sponte to rule that the duration of the detention made it an unconstitutional warrantless search.

AFFIRMED

10